# REKAB, INC. *v.* FRANK HRUBETZ & COMPANY, INC.

[No. 260, September Term, 1970.]

*Decided March 3, 1971.*

*Motion for rehearing filed March 8, 1971; denied March 9, 1971.*

The cause was argued before HAMMOND, C. J., and Mc-WILLIAMS, FINAN, SINGLEY and DIGGES, JJ.

*Albert D. Brault,* with whom were *Brault, Scott & Brault* on the brief, for appellant.

*J. Joseph Barse* for appellee.

MCWILLIAMS, J., delivered the opinion of the Court.

George Washington Gale Ferris (1859-1896) was a successful engineer. He is remembered for what was perhaps the least of his accomplishments — the Ferris wheel. We shall be concerned here with a mutation of its countless progeny. This one is known as the "Hydraulic Paratrooper Ride." Built by the appellee (Hrubetz) for the appellant (Rekab) it was put into service at Rekab's Glen Echo Amusement Park in the spring of 1963. On 27 July 1964 it collapsed, injuring Delores Hardy who thereafter sued both Hrubetz and Rekab. Her claim was settled by the entry of a consent judgment in the amount of $85,-000. In satisfaction of the judgment Hrubetz and Rekab each paid $42,500, each reserving the right to recover that amount from the other. Hrubetz sued Rekab, in August 1968, in the Circuit Court for Montgomery County. Rekab counterclaimed against Hrubetz. The first trial, in October 1969, was abortive—the jury was unable to agree. The second trial took place before Miller, J., without a jury, in June 1970. Hrubetz prevailed and from the ensuing judgment Rekab has appealed. In reciting the facts our use of "Hrubetz" will indicate either the appellee or

its principal stockholder and guiding spirit, Frank Hrubetz. The Baker we shall refer to is the owner and president of the appellant.

Hrubetz, a mechanical engineer, has been manufacturing "rides" for amusement parks at his plant in Salem, Oregon, since 1940. His products are highly regarded. Essentially they employ a large wheel from the perimeter of which are suspended seats for the patrons. The wheel is then made to rotate around a spindle, also called an axle or shaft. While the carrousel rotates in a horizontal plane and the Ferris wheel in a vertical plane, Hrubetz fastens his spindle to the top of a stout mast, setting the spindle at an angle of 45 degrees. Thus his wheel rotates in a plane halfway between the horizontal and the vertical. He dubbed it the "Spitfire" and during the succeeding 20 years he made and sold a number of them, one variation of which he called the "Paratrooper." Without exception, it seems, they functioned safely and satisfactorily.

In 1962 it occurred to Hrubetz that the "Paratrooper" might be more exciting and, of course, more profitable if the mast, or boom as he termed it, could be raised and lowered. When lowered the patrons could embark just as if they were boarding a carrousel. The operator could then cause the wheel to rotate and at the same time, using a hydraulic ram, raise the boom to an angle of about 45 degrees. After a minute or two the boom could be lowered and the rotation braked to a stop. The patrons would then disembark and the cycle could begin again. Calling it the "Hydraulic Paratrooper" he designed and built three of them. One was sold to an amusement park in Rye, New York; another went to Asbury Park, New Jersey. The third was bought by Baker who knew Hrubetz, having done business with him before. The instructions which came with the Hydraulic Paratrooper contained a paragraph cautioning the operator in lowering the boom to "feather" the hydraulic control valve so that the boom would come to rest slowly and gently. In August 1963 Hrubetz visited one of the two parks in the

New York area to observe the operation of its Hydraulic Paratrooper. He noticed that when the boom was lowered the hydraulic valve was not being feathered properly by the operator and that as a result the boom came down "against its lower support with considerable shock" causing undesirable oscillations which placed unforeseen strains on the spindle. After reviewing his original calculations he decided to redesign [1] the spindle so as to strengthen it. Using the same 1040 carbon steel he increased the diameter of the spindle from 5½ inches to 6½ inches. The corresponding increase in strength was said to be about 90 percent.

On 5 February 1964 Hrubetz sent the following letter to Baker:

"This is to advise that we are shipping via motor freight [from Oregon] a new main spindle shaft and new main bearing for your Paratrooper. We have decided to replace your original main spindle shaft for the reason that we believe that this part is subjected to strains which were not originally considered. We wish to assure you that of the three units with this size shaft in service there has been no trouble, and that this action on our part is purely precautionary.

"We expect to do this work at our expense and have engaged Mr. Fred Cerbini of Coney Island to make the installation. Please advise us when the shipment arrives in order that we may make final arrangements to do the job.

"Trusting this finds you well and with our kindest personal regards, we are,"

---

1. Rekab insists that Hrubetz did not "redesign" the spindle because he did not "design" it in the first instance, that he merely adapted the spindle used in the "fixed" or "standard" ride to the hydraulic ride. There had not, of course, been any failures in the many fixed rides he had manufactured and sold. Rekab insists also that Hrubetz could not have calculated the stresses which the 6½ inch spindle could be expected to sustain for, had he done so, he would have realized the inadequacy of the ones then in use.

The same letter was sent to each of the other two purchasers.

The spindle and bearing, total weight 420 pounds, arrived at Glen Echo on 19 February. Emory Crouch, Baker's superintendent, opened the crate, identified the contents, and then placed it in one of the park warehouses. Baker, who lives in Florida, telephoned Crouch and told him to advise Hrubetz of the arrival of the spindle and then put it away "until Mr. Cerbini showed up." He made no mention of the letter. Crouch told Hrubetz the spindle had arrived and by a telegram dated 9 March Hrubetz directed Cerbini to go to Glen Echo and install it.

At this point the record becomes somewhat less than clear. Hrubetz said he heard nothing from either Rekab or Cerbini for "two or three weeks." Then, he said, he learned from Crouch that Cerbini had not appeared. He called Cerbini who told him "his wife had been in a terrible automobile accident [,] * * * [and that she] had been in the hospital unconscious for over ten days." Cerbini said "she was getting better" and that he would go to Glen Echo "shortly." He tried, without success, to get in touch with Cerbini on several occasions thereafter. He called Crouch to find out if Cerbini had turned up. He was told, he said, that "they had gotten tired of waiting for * * * [Cerbini] and had made the repairs themselves." It appears to be conceded that Cerbini had no special skill or expertise in this regard and that any competent mechanic could have burned out the $5\frac{1}{2}$ inch spindle and installed the $6\frac{1}{2}$ inch replacement. Hrubetz heard nothing more until after the accident when Crouch called and said "the main shaft [spindle] broke." Hrubetz asked if it was "the new shaft." Crouch replied "no, we never put the new one in."

Crouch said he had asked Hrubetz if he "could go ahead and have the shaft installed" but that Hrubetz told him "no one could install it but his factory mechanic." About a week or ten days before opening date, 1 April, Crouch said he spoke to Hrubetz again and told him that he (Crouch) was "going to put the ride together" and that

if Hrubetz wanted to replace the shaft he would have to "take the ride down * * * and put it back [at Hrubetz's expense]." Crouch denied he ever told Hrubetz that he had replaced the shaft. Crouch never saw Hrubetz's letter to Baker of 5 February but he said Baker told him the reason for replacing the shaft was "to strengthen the ride." Had he seen the letter, he said, he "would not [have] put the ride together."

Dr. Carl Zapffe, a consulting metallurgist, whose expertise was not questioned, testified that Hrubetz had miscalculated the safety factor in designing the spindle. Judge Miller found that Hrubetz "used an improper design" and "that he failed to take into account the manner in which * * * [the] ride would be operated when put to use." Hrubetz replaced the spindles on the other two rides (at Rye and Asbury Park); nothing had gone amiss in the operation of either of them however.

The determinative issue, we think, is whether, in the circumstances revealed by this record, Hrubetz's letter of 5 February 1964 together with the delivery of the new spindle and main bearing amounted to a sufficient warning to Rekab of the likelihood of trouble. In 1 Frumer and Friedman, *Products Liability,* it is said:

> "The manufacturer's duty is not just to use reasonable care in designing or manufacturing his product. There may be a duty to warn even though the product is perfectly made. Many cases apply the rule that the manufacturer is under the duty to adequately warn of foreseeable and latent dangers attendant upon proper and intended use of his product." § 8.01, p. 143.

> "Even if there is no duty to warn at the time of the sale, facts may thereafter come to the attention of the manufacturer which make it imperative that a warning then be given." § 8.02, p. 148.3.

Rekab insists the warning must be accurate, strong, clear, appropriate and readily noticed, and that any ambiguity

in the words used must be construed against the one who chose them. There is no doubt that many decisions have applied all or some of those criteria.[2] It seems to us, however, that reasonableness, in the circumstances here present, is the concept to be applied. We said in *Levin v. Walter Kidde & Co., Inc.*, 251 Md. 560, 564 (1968),

> "The duty owed is a reasonable warning, not the best possible warning. The obviousness of the danger to the customer is a factor to be considered in determining the adequacy of the warning."

We regard as significant the fact that neither Crouch nor Baker were strangers to the amusement park business. Crouch, who was 64 years old at the time of trial, testified that he had been employed at Glen Echo Park continuously since February 1924. He operated rides until 1929 when he became the electrician. In 1953 he was made superintendent. Baker said he "bought the park in 1955." He was then a member of "the Association" which he agreed was an association "of amusement park operators and manufacturers." While he did not actually say so his testimony suggests that he had been in the business for quite some time prior to 1955. Counsel for Rekab has tried to cast Baker in the role of "businessman and real estate man" and, while it appears to be true that he left the day to day operation of Glen Echo Park to Crouch, it is clear that he made the major decisions. He negotiated the purchase of the Hydraulic Paratrooper but Crouch set it up after it was delivered in 1963. A mechanic from the Hrubetz factory supervised the work. After the job was finished, Crouch said the factory man instructed him how "to take the ride up and down and how to lower the ride and feather it down when it got

---

2. *See* Crouse v. Wilbur-Ellis Co., 77 Ariz. 359, 272 P. 2d 352 (1954); Tingey v. E. F. Houghton & Co., 30 Cal. 2d 97, 179 P. 2d 807 (1947); Tampa Drug Co. v. Wait, 103 So. 2d 603 (Fla. 1958); Marigny v. Dejoie, 172 So. 808 (La. App. 1937); Lovejoy v. Minneapolis-Moline Power Implement Co., 248 Minn. 319, 79 N.W.2d 688 (1956); Schilling v. Roux Distributing Co., 240 Minn. 71, 59 N.W.2d 907 (1953).

down to approximately so many feet." Although the ride was designed to be elevated to a height of 30 feet Crouch adjusted it so that 22 feet would be its maximum elevation. Why he did this was not shown.

It would be idle to entertain the notion that Baker and Crouch could have failed to be impressed by what Hrubetz did. The ride represented an expenditure of about $30,000 and it had been in operation for only one season. Yet here was Hrubetz, sua sponte, taking steps to replace, at his own expense, the existing spindle with one nearly twice as strong. That this was at least unusual there can be no doubt. Not only had he undertaken to procure and machine a sizeable chunk of steel to make the new spindle, he had also fabricated the large main roller bearing required by the increase in diameter. Both were crated and shipped 2500 miles across the continent. Then he engaged Cerbini to go to Glen Echo, burn out the old spindle and weld the new one into place. Next we have the letter stating his belief that the spindle "is subjected to strains which were not originally considered." There is the further information that the spindles in the other two units were also scheduled for replacement. Rekab's counsel make much of Hrubetz's assurance that the existing spindles had given no trouble and that the replacement was "purely precautionary." We can believe that none of this would have meant much to the ordinary citizen but to Baker and Crouch it had to be a tintinabular message. Knowing the function of the spindle they must be charged with an acute awareness of the possibility that a dozen or more citizens might be killed or injured if it failed. It seems to us the warning was, to Baker and Crouch, accurate, strong, clear, appropriate, and readily noticed. Rekab insists the statement that there had been no trouble with any of the units and that replacement was "purely precautionary" created an ambiguity since it could be taken as just another way of saying that the 5½ inch spindle was adequate for the purpose but that it might be a good idea to replace it with a spindle twice as strong. We could see some force

to this argument if Hrubetz intended to saddle Rekab with the expense of accomplishing the replacement; but the voluntary assumption by Hrubetz of the not inconsiderable expense involved imparted, in our judgment, an air of urgency that Baker and Crouch had to turn away from not to see. And turn away they did.

Crouch said he told Baker he was going to put the ride back together for the 1964 season, and that Baker agreed telling him that Hrubetz would have to take it down again when he put in the new shaft. The question and answer set forth below reveal the "thinking" of Baker and of Crouch.

> "Q. Did Mr. Abraham Baker ask you if you thought the ride would be safe with the old shaft in the machine and the new shaft in the warehouse? A. Naturally, Mr. Baker was thinking the same as I did. If it ran the year before and Mr. Hrubetz put the shaft in, *it was sure good enough for another year or even in the future.*" (Emphasis added.)

In fairness to Crouch, however, it should be recalled that he neither saw nor had read to him Hrubetz's letter of 5 February. Indeed it does seem that Baker may have misled him in this regard. Crouch said Baker told him only that the shaft was to be replaced to strengthen the ride. Had he seen it (the letter) he "would not [have] put the ride together."

Rekab seeks to justify its continuing to operate the Paratrooper by citing the failure of Cerbini to come to Glen Echo and do the work. It must be granted that neither Hrubetz nor Cerbini were prompt and diligent in this regard. Of course there is evidence of extenuating circumstances on the part of Cerbini and to an extent on the part of Hrubetz but we think this is less than small comfort to Rekab. It is agreed that any reasonably competent welder could have done the job under Crouch's supervision. Crouch must have been fully aware of this. He was intimately familiar with the mechanical aspects

of the ride. He had dismantled it and he had reassembled it. He had supervised the welding of additional gussets around the main bearing. He could have installed the new spindle or he could have waited for the arrival of Cerbini. Whether he chose the one or the other there is no doubt Hrubetz would have become liable for the ensuing expense and loss of revenue.

Judge Miller thought Rekab "owed a high degree of care to the customers who used the rides" and that it "was not an unknowledgeable purchaser." Crouch, he went on to say,

> "* * * had been in the amusement business for many years, and, in fact, supervised a number of repairs to the * * * [Paratrooper] before its collapse.
>
> "He was, however, not notified of the letter by Baker. Taking into consideration the degree of care owed by * * * [Rekab], the knowledge of * * * [its president, Baker] about the amusement business and the testimony of Mr. Crouch, the court finds as a matter of law that the notice * * * was sufficient to warn * * * [Rekab] of a potential danger to its customers and that the ride should have been out of operation at least until further inquiry was made and that * * * [Rekab's] continued use of the ride after such notice was in light of all of the facts and circumstances of this case negligent."

Judge Miller may have put it a little too high when he said the notice was sufficient as a matter of law. We think he intended to say that the application of the principles of law he thought to be controlling to his finding of fact justified his conclusion that the warning was sufficient. In that light we cannot say his finding of fact was clearly erroneous and we are satisfied that he applied the correct principles of law.

Rekab's counterclaim is based on what it insists was a breach of warranty by Hrubetz. It argues that the war-

ranty (if indeed one ever existed) must be considered to be still available to it because Hrubetz consented to the "continued use" of the ride and acknowledged "that such use would not be endangering Glen Echo customers." It cites decisions from other jurisdictions in support of its argument and, in other circumstances, they might well be apposite. Here, however, Judge Miller found the evidence to have been insufficient "to show that * * * [Hrubetz] consented or insisted that * * * [Rekab] continue to use the ride * * *." Since we do not think his finding in this regard was clearly erroneous Rekab's argument ends up in stays.

There remains Hrubetz's cross-appeal which has to do only with the matter of interest. He insists he is entitled to interest from 26 February 1968, the day on which he and Rekab each paid $42,500 in settlement of the claim of the Hardy girl. Judge Miller said he would not allow interest "as the parties in this case agreed to litigate the matter for their mutual benefit." While we think Judge Miller has put it rather too simply we agree that he has reached the correct result. Hrubetz derives much comfort from the opinion of Chief Judge Sobeloff (a former Chief Judge of this Court) in *Robert C. Herd & Co. v. Krawill Machinery Corp.*, 256 F. 2d 946, 953 (4th Cir. 1958). In his brief he set forth the following excerpt from the court's opinion:

> "Where, as here, the plaintiff was compelled to lay out large sums * * * [over a period of years,] full compensation would be denied him if he were not permitted to recover interest on the amount of his expenditures. As to those damages which represent substantial expenditures of definite sums, the claims became, in essence, ascertained from the time when the proven outlays were made, and interest should be computed on them."

He omitted from the excerpt the bracketed phrase, perhaps inadvertently. We choose to believe that counsel has

misread Judge Sobeloff's opinion. Taken as a whole we think it reflects quite accurately the applicable Maryland law as it has been set forth in *Stirn v. Segall,* 251 Md. 240, 245 (1968), *Atlantic States Constr. Co. v. Drummond & Co., Inc.,* 251 Md. 77, 85 (1968), *Peerless Insurance Co. v. Prince George's County,* 248 Md. 439, 442 (1968), *Brown v. Bradshaw,* 245 Md. 524, 539 (1967), *Affiliated Distillers Brands Corp. v. R.W.L. Wine and Liquor Co.,* 213 Md. 509, 516-520 (1957), and the Maryland cases cited by Judge Sobeloff, and nothing is to be gained by repeating it here. Judge Miller must have observed, as indeed must anyone after a moment's reflection, that, while Hrubetz laid out the money, it did not come into the possession of Rekab. It was laid out to serve Hrubetz's interests and that it may also have served Rekab's interests matters not since Rekab's contribution of the same amount of money may also have served Hrubetz's interest and if it did, it was in a precisely equal degree. Had Rekab prevailed the logic and the result would have been the same.

> *Judgment affirmed. Costs to be paid by the appellant.*