[Civ. No. 38960. Second Dist., Div. Two. Dec. 26, 1972.]

JUANA BALIDO, Plaintiff and Appellant, v.
IMPROVED MACHINERY, INC., et al., Defendants and Respondents.

## COUNSEL

Davis, Flaum & Greene, R. Browne Greene and Edward L. Lascher for Plaintiff and Appellant.

Kinkle, Rodiger, Graf, Dewberry & Spriggs, George P. Kinkle, Jr., David L. Jolliffe, Schell & Delamer, Fred B. Belanger and Abe Mutchnik for Defendants and Respondents.

## OPINION

**FLEMING, J.**—In 1965 Juana Balido's right hand was crushed when a plastic injection molding press closed as she was adjusting an insert. Balido brought an action for negligence, breach of warranty, strict liability, and intentional misconduct against the manufacturer of the press, Improved Machinery, Inc. (Improved); against the former owner of the press, Paper Mate Manufacturing Company (Paper Mate); and against her employer and the owner of the press at the time of the accident, Olympic Plastics Company, Inc. (Olympic). After the presentation of plaintiff's case, the trial court entered judgment of nonsuit in favor of all defendants. Balido appeals.

In ruling on a nonsuit a court must disregard conflicting evidence, give to plaintiff's evidence all value to which it is legally entitled, and indulge plaintiff in every legitimate inference that may be drawn from the evidence. (*Elmore* v. *American Motors Corp.*, 70 Cal.2d 578, 583 [75 Cal.Rptr. 652, 451 P.2d 84].) The evidence showed:

Improved designed and manufactured the plastic injection molding press in New Hampshire in 1950-1951 and sold it to Paper Mate in California in 1953. Paper Mate sold the press to Olympic in 1958. As originally designed and manufactured, the press contained a lift safety gate which

when fully closed covered the operating area of the press. As the safety gate turned on its pivot in closing, it triggered an electric limit switch near the gate's pivot point, and the switch in turn activated the press and permitted its platens to close. The electric limit switch, a standard item of equipment procured from another manufacturer, was adjustable, and an improper adjustment of the switch could allow the press to activate while the gate was open as much as 10 degrees, an opening that amounted to five inches at the far end of the gate. In the opinion of two industrial safety engineers the lift gate and electric limit switch as originally designed and installed did not provide adequate safety for the operator of the press.

After the press had been sold to Paper Mate, Improved learned that operators of similar presses were being injured and that a California industrial safety order in effect since 1949 required more comprehensive safety devices for plastic molding presses than Improved had originally installed. Specifically, the industrial safety order required that plastic presses be equipped with either a sliding gate or dual hand controls. (A sliding gate would alleviate the problem of untimely activation, while dual hand controls would keep both operator's hands away from the press during its closing cycle.) Starting in 1954 Improved incorporated into its new presses a package of additional safety devices, which it then offered for sale with free installation to owners of its earlier-model presses. The package included a sliding gate, an additional gate-activated switch that limited the hydraulic system, and a metal bar that held the press platens apart while the gate was open. Paper Mate added the hydraulic limit switch to the press but did not install the other devices. It subsequently sold the press to Olympic.

On several occasions a sales-and-service representative of Improved notified Olympic that the press did not meet California's industrial safety standards and suggested that Olympic purchase Improved's package of additional safety devices for $500. Improved also sent two letters to Olympic pointing out the safety deficiencies of the press and calling attention to the California industrial safety order. These letters are set out below.[1]

Olympic did not install any additional safety devices on the press.

On 25 January 1965 Balido was operating the plastic molding press on her job at Olympic. She reported to her supervisor the press was working faster than usual, and the latter told her to be sure the insert did not fall out. During one of the molding operations the insert began to fall out, and Balido opened the gate and put her right hand in the press to adjust the

---

[1]See Appendices "A" and "B," *post,* pp. 654, 655.

insert. The press closed, crushing her hand with 175 tons of pressure and causing her to lose three fingers and part of the fourth on her right hand.

Subsequently, Balido obtained permanent disability benefits for her injuries under workmen's compensation.

At the trial an industrial safety engineer and a state safety engineer testified that in their opinion the accident occurred because the safety devices on the press were inadequate and ineffective.

■ *Olympic.* The trial court properly granted a nonsuit in favor of Olympic. The California workmen's compensation law makes the right to recover workmen's compensation the exclusive remedy of an employee against his employer for personal injuries. That remedy includes accidents that involve the employer's willful misconduct, in instances of which the amount of compensation recoverable by the employee may be increased by one half, but not in excess of $7,500. (Lab. Code, §§ 3601, 4553.) Once the jurisdiction of the workmen's compensation law has been properly invoked, it is exclusive. (*Scott* v. *Industrial Acc. Com.,* 46 Cal.2d 76, 82-83 [293 P.2d 18]; see 2 Hanna, Cal. Law of Employee Injuries and Workmen's Compensation (2d ed.) § 22.03.)

Olympic employed Balido. She received permanent disability benefits under workmen's compensation for injuries on the job. She had no cause of action against her employer for her injuries, and judgment of nonsuit was properly entered in Olympic's favor.

■ *Paper Mate.* The trial court likewise correctly entered judgment of nonsuit in favor of Paper Mate. The only evidence concerning Paper Mate, the prior owner of the press, showed it had been warned of the press's safety deficiencies and had installed a hydraulic safety limit switch before selling the press to Olympic.

Balido's complaint against Paper Mate charged negligence, breach of warranty, and strict liability. The evidence fails to support these allegations. On negligence, there was no evidence that Paper Mate's failure to purchase the entire package of additional safety devices was causally related to Balido's accident. On breach of warranty, there was no evidence that Paper Mate gave any express warranties when it sold the press to Olympic some seven years prior to the accident. And because Paper Mate did not deal in plastic molding presses, its sale of the press did not carry implied warranties of merchantability and fitness for intended use. (Com. Code, § 2314; former Civ. Code, § 1735, subd. (2).) On strict liability, there was nothing to suggest that Paper Mate was a conduit for the production

or distribution of Improved's presses. Paper Mate was no more than a one-time "occasional seller" who does not become subject to strict liability for manufacturing or design defects. (*Silverhart* v. *Mount Zion Hospital,* 20 Cal.App.3d 1022, 1026 [98 Cal.Rptr. 187]; Rest.2d Torts, § 402A, com. f.)

■ *Improved.* On the cause of action for intentional misconduct the trial court granted a nonsuit in favor of Improved, the manufacturer of the press, because it found no evidence of intentional misconduct and no evidence of any attempt to hide the safety deficiencies in the press. With this conclusion we agree.

■ There remain for consideration the negligence, warranty, and strict liability counts against Improved. The theory of these counts is that Improved negligently and deficiently designed, manufactured, and sold a press whose inadequate safety devices made it unreasonably dangerous to operate. Although separate counts for negligence, warranty, and strict liability have been pleaded, we view them as stating a single cause of action, in that the complaint seeks damages for personal injuries caused by deficiencies in the design of a manufactured product. As Professor Wade has pointed out, the manufacturer is not an insurer of the safety of its product, and the test for strict liability is the same as that for negligence, except for the element of scienter. (Wade, *Strict Liability of Manufacturers,* 19 Sw. L.J. 5, 15-17.) Strict liability for deficient design of a product (as differentiated from defective manufacture or defective composition) is premised on a finding that the product was unreasonably dangerous for its intended use, and in turn, the unreasonableness of the danger must necessarily be derived from the state of the art at the time of design. (*Thompson* v. *Package Machinery Co.,* 22 Cal.App.3d 188, 191-192 [99 Cal.Rptr. 281].) A danger is unreasonable when it is foreseeable, and the manufacturer's ability, actual, constructive, or potential, to forestall unreasonable danger is the measure of its duty in the design of its product. A manufacturer's failure to achieve its full potential in design and thereby forestall unreasonable danger forms the basis for its strict liability in tort. It is a liability whose essence parallels the lack of due care that is the essence of its liability for negligence. It may be seen, therefore, that in cases involving deficient design, foreseeability is merely scienter under another name. Since the issue is whether Improved designed and put into circulation a product unreasonably dangerous for use and since the unreasonableness of the danger must be determined by the potential available to the designer at the time of design, it is apparent that the strict liability and negligence claims merge. The same is true of the warranty claim, for in personal injury product-liability actions not involving a commercial relationship

between manufacturer and injured person, the warranty formulation adds nothing to that of strict liability and negligence.[2] (Rest.2d Torts, § 402A, com. m.) Consequently, we treat plaintiff's three counts as stating a single cause of action.

For purposes of nonsuit Improved conceded the existence of deficient design, a concession that would ordinarily make the question of its liability for an unreasonably dangerous product one for the trier of fact. Improved's concession was neither misguided nor inadvertent, for the press as designed in 1950-1951 did not meet the standard of a 1949 California industrial safety order that required plastic presses to be equipped with sliding gates or with dual hand controls. ▮ Noncompliance with a standard set out in an industrial safety order furnishes probative evidence of deficient design, even though the order is directed at the user of equipment and not at its manufacturer. (See *Di Muro* v. *Masterson Trusafe Steel Scaffold Co.*, 193 Cal.App.2d 784, 790-791 [14 Cal.Rptr. 551].) ▮ Nevertheless, the trial court concluded that two factors relieved the manufacturer from liability for deficient design and compelled the nonsuit: (1) the long interval of time between the deficient design and the injury, and (2) the multiple warnings of safety deficiency given the owner of the press by the manufacturer. We consider the weight and effect of these two factors.

1. Passage of time may become a critical factor in litigation because of its effect on the reliability of proof of fact. But critical to proof of what fact? Here, the three essentials of plaintiff's proof are plaintiff's injury, the deficient design, and the causal connection between injury and design. Obviously, passage of time did not affect the reliability of plaintiff's proof of injury. Passage of time might have been a critical factor in plaintiff's proof of deficient design, for with lapse of time records are lost, memories grow dim, contemporaneous circumstances become difficult to reconstruct, and earlier thought processes on design become difficult to fathom. What physicians thought about circulation of the blood before Harvey and what scientists thought about cosmography before Copernicus are difficult to

---

[2]"Accordingly, rules defining and governing warranties that were developed to meet the needs of commercial transactions cannot properly be invoked to govern the manufacturer's liability to those injured by its defective products unless those rules also serve the purposes for which such liability is imposed." (*Greenman* v. *Yuba Power Products, Inc.*, 59 Cal.2d 57, 63 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049].)

"The law of sales has been carefully articulated to govern the economic relations between suppliers and consumers of goods. The history of the doctrine of strict liability in tort indicates that it was designed, not to undermine the warranty provisions of the sales act or of the Uniform Commercial Code but, rather, to govern the distinct problem of physical injuries." (*Seely* v. *White Motor Co.*, 63 Cal.2d 9, 15 [45 Cal. Rptr. 17, 403 P.2d 145].)

recapture and almost impossible to fully appreciate. Yet in this case these hypothetical difficulties need not trouble us, for the simple reason that Improved conceded the existence of deficient design in 1950-1951.

Passage of time, then, bears only on the third essential of plaintiff's proof—the causal connection between injury and design. The problem arises as a by-product of the inevitability of change, for change brought about by time unravels the connection between prior cause and later effect. Did the product fail because it was badly designed or because it was badly manufactured? Because badly manufactured or badly maintained? Badly maintained or abused in use? Abused in use or because it wore out? Here, we find ourselves deep in the labyrinth of causation, where passage of time almost inevitably brings its concomitant of multiple cause and multiple effect. In working our way out of this labyrinth legal rules, inferences, presumptions furnish little help, for the basic problem is one of reliability of proof.

In areas where the problem of time, change, and causation has proved particularly troublesome the Legislature has provided the courts with arbitrary mechanical solutions, often in the form of statutes of limitation. These statutes, although couched as procedural limitations on the time within which to bring suit, in effect terminate substantive liability by decreeing that after the passage of a specified time the causal connection between defect and injury will no longer be legally recognized. Examples of recent legislative pronouncements affecting causation are the statute limiting certain malpractice actions against physicians and hospitals to four years from the date of injury (Code Civ. Proc., § 340.5), and the statute limiting actions against developers, contractors, and architects for latent deficiencies in the supervision, construction, and design of an improvement in real property to 10 years. (Code Civ. Proc., § 337.15.) But no such legislative aids for evaluating causation have been adopted in product liability, and the courts have been required to work out their own solutions.

In substance, the basic rule in current use declares that the effect of lapse of time on causation is a question for determination by the trier of fact within the limitations of legal cause. Concededly, so loose a rule may not be wholly satisfactory to lawyers advising clients, but for courts and judges it suggests that in most cases the issue of causation should be submitted to the trier of fact, at least whenever a theory of causation can be plausibly sustained. Consider a few representative cases:

1. *Pryor* v. *Lee C. Moore, Corporation* (10th Cir. 1958) 262 F.2d 673, 675. Fifteen years' safe use of an oil derrick did not foreclose suit for

personal injuries against the manufacturer of the derrick on the claim of a defective weld at the foot of one leg of the derrick. "[P]rolonged use of a manufactured article," said the court, "is but one factor, albeit an important one, in the determination of the factual issue whether the negligent manufacture proximately caused the harm."

2. *City of Brady, Texas* v. *Finklea* (5th Cir. 1968) 400 F.2d 352, 357. A municipality that had negligently constructed and installed an electrical transmission line in 1935 was held liable for the electrocution of plaintiff's decedent 28 years later in 1963.

3. *International Derrick & Equipment Co.* v. *Croix* (5th Cir. 1957) 241 F.2d 216. The manufacturer of an oil derrick that had been in use for seven years, three of them in the Dominican Republic, was held liable for personal injuries that resulted from a defective weld on the leg of the derrick.

4. *Tucker* v. *Unit Crane & Shovel Corp.* (1970) 256 Ore. 318 [473 P.2d 862, 863]. The Supreme Court of Oregon affirmed a judgment against a manufacturer for personal injuries resulting from the collapse of the boom of a crane that had been in use for nine years. "Despite the age and long use of the crane in this case," said the court, "the inquiry is the same as in other products liability cases—was the product defectively manufactured and was the defect the cause of injury?"

5. *Hale* v. *Depaoli,* 33 Cal.2d 228 [201 P.2d 1, 13 A.L.R.2d 183]. The California Supreme Court in 1948 reversed a nonsuit in favor of a building contractor who had been sued for personal injuries for defective construction in 1925 of a porch railing that gave way 18 years later. Lapse of time, declared the court, did not insulate the contractor from liability as a matter of law but made the question one of fact.

6. *Fredericks* v. *American Export Lines* (2d Cir. 1955) 227 F.2d 450, 452. Judgment was affirmed against the fabricator of a stevedore skid iron in favor of a longshoreman who had been injured when one of the skid iron supports on the stevedore skid broke, even though the skid iron had been exposed to rough handling for two and a half years. "The mere passage of time," said the court, "confers no immunity upon a negligent wrongdoer; but it has relevance to the likelihood, depending upon the circumstances of a particular case, that deterioration due to use, perhaps accelerated by misuse, will be mistaken by a jury for a defect due to negligent manufacture or fabrication. [W]e cannot say the jury went beyond permissible and rational inference in attributing the accident to [defendant's] negligent fabrication of the skid iron, which cracked and came apart.

despite at least two and one-half years of apparently safe use and normally rough handling. [Citations.]"

In extreme cases passage of time may create such a high probability of superseding causation that a court will rule as a matter of law that a manufacturing defect could not have been the proximate cause of an injury. Thus in *Bradler* v. *Craig,* 274 Cal.App.2d 466 [79 Cal.Rptr. 401], a homeowner sought damages against a general contractor for negligent construction of a house the contractor had built 18 years previously. The complaint asserted the house had been owned for 17 years by other owners, who knew of the defects but took no corrective action. The court, after observing that the general contractor may have destroyed his records, forgotten the job, and lost track of his employees, ruled as a matter of law that the contractor's duty had lapsed with the passage of time.

At bench, the circumstances in no wise appear extraordinary. For purposes of nonsuit Improved conceded deficient design of the press. Moreover, from the first year of manufacture Improved had been put on notice that this model press might be causing injuries attributable to inadequate safety controls. The product was an item of capital equipment sold to a small market and a limited number of customers, and its continuing superintendence did not present the difficulties associated with such mass consumer products as automobiles, refrigerators, and washing machines. To the contrary, Improved kept track of this particular press at all times through repair and maintenance records. We cannot say this is one of those extreme cases that would require a trial court to rule as a matter of law that passage of time had broken the causation between deficiency and injury and terminated the manufacturer's liability. We conclude, therefore, that passage of time did not justify the nonsuit but rather presented a question for the trier of fact.

2. The second factor relied upon by the trial court to support the nonsuit was the series of warnings given the owner of the press by its manufacturer. The court viewed the owner's disregard of these warnings as a superseding cause of the injury that legally relieved Improved from liability for its antecedent deficient design. The court concluded that Olympic's continued use of the press after it had been warned of the press's safety deficiencies constituted a superseding cause of the injury that cut off Improved's liability for deficient design. In familiar legal terminology Improved's deficient design ceased to be a proximate cause of Balido's injury and receded to a remote cause of the injury. Olympic's knowing disregard of the industrial safety order, the trial court said, introduced an unforeseeable element that amounted to a legally superseding cause of the accident.

In this second aspect of the case the basic question is whether as a matter of law the obligation of the original wrongdoer has been replaced by that of a third-party wrongdoer. On the shift of responsibility from one wrongdoer to another, Restatement Second Torts, section 452(2), comment f, has this to say: "It is apparently impossible to state any comprehensive rule as to when such a decision [shift of duty] will be made. Various factors will enter into it. Among them are the degree of danger and the magnitude of the risk of harm, the character and position of the third person who is to take the responsibility, his knowledge of the danger and the likelihood that he will or will not exercise proper care, his relation to the plaintiff or to the defendant, the lapse of time, and perhaps other considerations. The most that can be stated here is that when, by reason of the interplay of such factors, the court finds that full responsibility for control of the situation and prevention of the threatened harm has passed to the third person, his failure to act is then a superseding cause, which will relieve the original actor of liability."

On the specific issue before us, whether Olympic's failure to heed the warnings of inadequate safety devices amounted as a matter of law to a superseding cause of the injury, we consider the following propositions relevant:

(a) The extent to which third-party neglect supersedes deficient design as the legal cause of an injury depends on the foreseeability of the third-party neglect. (*Fredericks* v. *American Export Lines* (2d Cir. 1955) 227 F.2d 450, 453-454.)

(b) The degree of foreseeability charged to the designer of a product depends on the degree of danger involved in its use.

(c) A molding press is a highly dangerous piece of machinery. ·

(d) In other instances involving the use of comparable dangerous machinery the extent of the designer's duty to anticipate safety neglect by the owners of the machinery has been ruled a question of fact.

The basic question is whether the court should pass on superseding cause as matter of law or the jury should do so as matter of fact. ▆ From our reading of the cases we conclude that the extent to which designers and manufacturers of dangerous machinery are required to anticipate safety neglect presents an issue of fact. The full extent of this responsibility may be seen in two recent New Jersey decisions, *Bexiga* v. *Havir Manufacturing Corp.* (1972) 60 N.J. 402 [290 A.2d 281], and *Finnegin* v. *Havir Manufacturing Corp.* (1972) 60 N.J. 413 [290 A.2d 286]. *Bexiga* involved injuries sustained in 1966 by the operator of a power

press that had been sold by the manufacturer without safety devices in 1961 and had not been equipped with safety devices during the intervening five years. The undisputed custom of the trade at the time of sale was for the purchaser, not the manufacturer, to equip the press with safety devices appropriate to the particular use the purchaser intended to make of the press. The New Jersey Supreme Court ruled the trial court should not have dismissed the operator's action against the manufacturer, because the question whether the manufacturer created an unreasonable risk of harm by putting into channels of trade a product capable of being used without safety devices remained one of fact. Someone else's obligation to install safety devices on dangerous machinery, said the court, did not legally immunize the manufacturer from liability for itself failing to do so. Where an unreasonable risk of harm was present in the operation of a machine without protective safety devices a jury might infer that the machine was defective in design. The custom of the trade, while evidential, was not conclusive on the question whether the manufacturer could have reasonably foreseen that the purchaser would not install safety devices.

The second New Jersey case, *Finnegin,* likewise involved injury to the operator of a punch press and a tort claim against the manufacturer for deficient design. The press had been manufactured and sold without safety devices in 1949, and at the time of the accident in 1966 it had still not been equipped with safety devices. Again, the New Jersey Supreme Court held it a question of fact whether the manufacturer of dangerous machinery was entitled to rely on the purchaser to install safety devices or whether the manufacturer should have reasonably foreseen that the purchaser might not do so.

A comparable ruling is found in *Rhoads* v. *Service Machine Company* (E.D.Ark. 1971) 329 F.Supp. 367, where the issue was whether an owner's misfeasance in failing to correct safety deficiencies in a press absolved a manufacturer from liability for injuries suffered by the operator of the press. The press had not been equipped with a safety guard as part of its original equipment. However, the press had been shipped with dual hand controls, it contained a sign warning the operator of the press against its use without a safety guard,[3] and prior to the accident the owner had been ordered by the Arkansas Department of Labor to install a safety guard on the press. The owner of the press neglected to install a safety

---

[3] "WARNING

Never Place Hands Under Ram or Within Die Area.
Stop Motor And Block Ram When Changing Dies.
Adequate Safety Guards Must Be Provided By The Owner Of This Press To Prevent The Operator's Hands From Entering Die Area." (*Rhoads* v. *Service Machine Company,* 329 F.Supp. 367, 370.)

guard, de-activated the dual hand controls, and put in a foot-pedal control whose accidental tripping brought about the operator's injuries. Despite these incidents of owner misfeasance, the court upheld a jury verdict against the manufacturer on the theory that the latter had put into channels of trade a press equipped with insufficient safety devices. The court rejected the argument that the owner's failure to comply with the order of the Arkansas Department of Labor to install a safety guard amounted to a superseding cause of the accident that would immunize the manufacturer from liability, for, said the court, the latter should have foreseen that the owner of the press might fail to install a safety guard and fail to comply with a state safety order requiring him to do so. The ruling, therefore, amounts to a direct holding that an owner's lack of compliance with a state safety order does not release a manufacturer from liability for injuries attributable to deficient safety design. In this respect it parallels the rulings in the New Jersey cases of *Bexiga* and *Finnegin,* where the court pointed out that violation of the New Jersey safety code by an owner did not absolve the manufacturer of a dangerous product from liability for defective design.

The *Rhoads* case is also significant in that the court rejected the argument that the warning notice on the press immunized the manufacturer from liability. Obviously, if a warning affixed to the machine itself and given directly to its operator does not insulate the manufacturer from liability for deficient design, a warning given to the owner of the machine, a warning that may never reach the actual operator, is equally ineffective in creating such insulation.

We are persuaded by these cases that with respect to machinery dangerous to life and limb the question of superseding cause between successive wrongdoers presents an issue for determination by the trier of fact. *Stultz v. Benson Lumber Co.,* 6 Cal.2d 688 [59 P.2d 100], does not compel a different result. In *Stultz,* plaintiff's employer purchased a defective plank from defendant supplier, and the employer, with knowledge of the plank's defective condition, used it to construct a scaffold whose later collapse injured plaintiff. The court held the employer's knowing use of the defective plank terminated as a matter of law defendant's liability for supplying the plank. The decision in *Stultz* rests on what the court later described as its highly extraordinary facts, and its value as precedent appears limited to acts of positive wrongdoing. (See *Rae* v. *California Equipment Co.,* 12 Cal.2d 563, 570-572 [86 P.2d 352], and *Stewart* v. *Cox,* 55 Cal.2d 857, 865 [13 Cal.Rptr. 521, 362 P.2d 345].)

Thus far we have examined the issue of superseding cause largely on the

assumption that deficient design creates a static element not susceptible to later change. But the specific issue at bench involves the liability of a manufacturer initially deficient in the design of its product, who later attempted to correct its initial deficiency. Is such a manufacturer required to anticipate a particular kind of third-party neglect—the failure of an owner to respond to a specified warning of danger?

As a general proposition it can be said that a manufacturer who has taken all reasonable steps to correct its error may succeed in absolving itself from future liability. An example of the manufacturer's ability to terminate its liability for deficient design is found in the leading case of *Ford Motor Co.* v. *Wagoner* (1946) 183 Tenn. 392 [192 S.W.2d 840, 842, 164 A.L.R. 364, 371], where an automobile manufacturer discovered a defect in a hood catch and distributed an auxiliary catch to its dealers with instructions to install the catch on defective automobiles at no cost. The owner of an automobile with the defective catch refused to have the auxiliary catch installed, and a subsequent owner of the vehicle was injured in an accident caused by the defect. The court held that the original owner's refusal to accept free repair of the defect amounted to an independent superseding cause of the accident that cut off the manufacturer's liability. (See Rest.2d Torts, § 452, illus. 10.) Similarly in *Rekab, Inc.* v. *Frank Hrubetz & Company* (1971) 261 Md. 141 [274 A.2d 107], the court found that a manufacturer of Ferris wheels did all that was reasonably possible to correct a deficiency in the design of one of his products when he notified the customer of the deficiency, shipped free replacement parts, and offered free installation of the new parts.

The infinite variety of factual situations arising out of corrective efforts highlights the factual nature of an inquiry as to whether the manufacturer has done what it could reasonably be expected to do to correct an earlier design deficiency. Central to the inquiry here is the question whether under the particular circumstances the manufacturer could have reasonably foreseen that *the neglect of third persons to respond to the manufacturer's warnings of danger would frustrate its corrective efforts.* Insofar as machinery dangerous to life and limb is involved, we think it a question of fact whether a manufacturer would reasonably anticipate that a wholesaler, a dealer, a retailer, an owner, or a user, may not positively respond to warnings of the need to correct a design deficiency. (*Ford Motor Co.* v. *Robert J. Poeschl, Inc.,* 21 Cal.App.3d 694 [98 Cal.Rptr. 702]; Rest.2d Torts, § 388, com. on cl. (c); cf. *Vandermark* v. *Ford Motor Co.,* 61 Cal.2d 256, 261 [37 Cal.Rptr. 896, 391 P.2d 168].) It is also a question of fact whether the manufacturer of a deficiently designed product could reasonably foresee that a purchaser of the product would not spend additional money to correct the deficiency. Undoubtedly, the

manufacturer of a deficiently designed product finds itself in a difficult position when in good faith it attempts to correct a deficiency. Yet its position is not impossible, and the trier of fact may not necessarily decide the issue adversely to the consciencious manufacturer. In *Rekab,* for example, the trier of fact, concluding that the manufacturer had taken all reasonable steps to correct its design deficiency, entered judgment in the manufacturer's favor.

Improved relies heavily on *E. I. Du Pont De Nemours & Co.* v. *Ladner* (1954) 221 Miss. 378 [73 So.2d 249], and *Nishida* v. *E. I. Du Pont De Nemours & Company* (5th Cir. 1957) 245 F.2d 768, two cases involving a chemical manufacturer's warning to a processor of soybean meal that use of the manufacturer's chemical in the processing of soybean meal made the meal dangerous for cattle. In spite of this explicit warning the soybean processor continued to sell its existing stock of soybean meal as cattle feed, and dairy herds of purchasers of the cattle feed were injured. In both cases the court viewed the conduct of the soybean processor as a superseding cause of the injury to the dairy herds and absolved the chemical manufacturer from liability. We find these cases readily distinguishable from that at bench in that the hazards they presented did not involve danger to human life and limb.

In the present case a trier of fact might have concluded that Improved had not done everything reasonably within its power to prevent injury to Balido. (Cf. *Ford Motor Co.* v. *Robert J. Poeschl, Inc.,* 21 Cal.App.3d 694, 698-699 [98 Cal.Rptr. 702].) Improved warned Olympic on several occasions that the press did not meet California industrial safety standards, but offered to conform the press to those standards only at a cost of $500. Quaere: Should Improved have reasonably anticipated that a purchaser of a second-hand press would ignore its warnings of inadequate safety devices and refuse to spend money to purchase additional safety equipment? In our view this question remained open for decision by the trier of fact, and hence the judgment of nonsuit was improper.

The judgment for Olympic and Paper Mate is affirmed. The judgment for Improved is affirmed on the fourth cause of action for willful misconduct and reversed on the first, second, and third causes of action. Respondents Olympic and Paper Mate to recover costs from appellant Balido, and appellant Balido to recover costs from respondent Improved Machinery, etc.

Roth, P. J., concurred.

**COMPTON, J.,** Concurring and Dissenting.—I concur in affirming the judgment of nonsuit as to Paper Mate and Olympic. I would also affirm the judgment as to Improved.

In my opinion the majority correctly concludes that the mere passage of time, by itself, is not sufficient to terminate Improved's liability. On the other hand, the majority errs in its analysis of the effect of Olympic's conduct on Improved's continued liability.

At the outset it is clear that the injury was essentially the result of an industrial accident. As a consequence, plaintiff will be compensated for the injury according to the provisions of the workmen's compensation law which presumably is structured to adequately redress the injury.

Workmen's compensation awards may not be as lucrative as judgments obtained in regular tort actions because the former do not deal with that elusive and amorphous concept of "pain and suffering." This difference, however, is more than adequately offset by the fact that industrial employees as a class benefit from liberal construction of the term "scope of employment" and from the elimination of contributory negligence as a defense to recovery.

If, in the instant case, the offending machine had been manufactured by Olympic itself for use in its own fabrication process, plaintiff would be limited to recovery under workmen's compensation. To hold that Improved's liability is an open question of fact is to make it possible for a jury to zero in on a "target" defendant and render a judgment which may be based on emotion rather than sound legal or equitable principles, an abdication of judicial responsibility.

It is to be assumed that plaintiff in the court below has presented her case to the best of her ability. The facts are now before the court without dispute. Analysis of these facts in the light of applicable legal principles is a question of law. (*Ford Motor Co.* v. *Robert J. Poeschl, Inc.,* 21 Cal. App.3d 694 [98 Cal.Rptr. 702].) Such analysis inescapably points to the correctness of the trial court's judgment of nonsuit.

The principal factor relied upon by the trial court to support the nonsuit was that Olympic's continued use of the press after it had been warned of the press' safety deficiencies constituted a superseding cause of the injury that cut off Improved's liability. In familiar legal terminology Improved's deficient design ceased to be a proximate cause of Balido's injury and became a remote cause of the injury. Olympic's knowing disregard of the industrial safety order, the trial court said, introduced an unforeseeable element that amounted to a legally superseding cause of the accident.

In this second aspect of the case the basic question is whether as a matter of law the obligation of the original wrongdoer has been replaced by that of a third-party wrongdoer to another. Restatement Second Torts, sec-

tion 452(2), comment f, cited by the majority has this to say: "It is apparently impossible, to state any comprehensive rule as to when such a decision [shift of duty] will be made. . . . *[W]hen . . . the court finds that full responsibility for control of the situation and prevention of the threatened harm has passed to the third person, his failure to act is then a superseding cause, which will relieve the original actor of liability.*" (Italics added.)

Improved designed and manufactured its machine some 14 years prior to the injury and sold the machine some 12 years prior to the injury. Upon subsequently learning of the possible deficiency in the machine's safety components, it notified Olympic, which was then in complete control of the machine. Olympic with full knowledge of the possible danger continued to use the machine. At that point in time Improved was in no position to prevent Olympic's continued use of the machine. Improved could not physically take possession of the machine nor enter Olympic's plant to make any physical changes in the machine.

Plaintiff contends that whether Improved had done everything it could to prevent the injury was a factual issue for the jury. But it is difficult to see what else Improved could have done other than to offer to install new safety devices free of charge instead of for $500. Whether Improved should have offered to make the change free or at a price less than $500 is irrelevant. No evidence was offered to indicate that Olympic would have permitted or effected the modification of the machinery even if Improved had offered to do it free. Such an offer on the part of Improved would only have aggravated Olympic's culpability—it would not have changed the basic situation. Olympic's knowledge of the deficiency was clearly established and its continued use of the machine was tantamount to intentional misconduct.

Whether Olympic or Improved should bear the cost of the modification of the machinery was a matter between those two parties, and Olympic should not be permitted to deliberately perpetuate Improved's exposure to a liability it was seeking in an urgently reasonable fashion to avoid. In the final analysis plaintiff's claim of negligence against Improved rests upon its obligation to have foreseen at the time of manufacture that plaintiff's employers would continuously disregard the law and all offers to make the machine safe. Plaintiff does not claim negligence in Improved's failure to take reasonable steps to prevent Olympic's continued use of the machine after discovery of the defect.

An examination of the myriad of cases both in California and elsewhere which have, under varying factual situations dealt with the issue of whether the intervening conduct of third persons does or does not break the chain of causation, reveals a repetition of familiar legal phrases with vary-

ing results from their application. Such examination produces the conclusion as quoted, *supra,* from the Restatement that "It is apparently impossible to state any comprehensive rule . . . ."

One of the most familiar and oft stated rules to be found in the cases is that the intervening act of a third party does not relieve the original wrongdoer of liability if the intervening act was reasonably foreseeable. (Rest. 2d Torts, § 447; *Warner* v. *Santa Catalina Island Co.,* 44 Cal.2d 310 [282 P.2d 12].) Similarly, if the realizable likelihood that a third person may act in a particular manner is the hazard which makes the act negligent, such an act, whether innocent, negligent or intentionally tortuous, does not relieve the original actor from liability. (*Barclay Kitchen, Inc.* v. *California Bank,* 208 Cal.App.2d 347 [25 Cal.Rptr. 383].)

On the other hand it has been said that where an independent negligent act or defective condition sets into operation the circumstances which result in injury because of a prior defective condition, the subsequent independent act or condition is the "proximate cause" of the injury. (*Hayden* v. *Paramount Productions, Inc.,* 33 Cal.App.2d 287 [91 P.2d 231].) Also, a prior or remote cause cannot be made the basis of an action if such remote cause merely furnished the condition by which the injury was made possible and there intervened a successive, distinct and efficient cause, notwithstanding that the injury would not have happened but for such prior condition. (*Camp* v. *Peel,* 33 Cal.App.2d 612 [92 P.2d 428].) "In general, when a third person becomes aware of danger, or should, if he acted reasonably, be aware of it, a defendant has a right to assume that he will act reasonably and will not be held liable for the intervening act. It is only where the intervening misconduct is to be anticipated, 'and the risk of it was unreasonable, that liability will be imposed . . . .' (Prosser, [Torts, 3d ed.] p. 323)." (*Premo* v. *Grigg,* 237 Cal.App.2d 192, at p. 195 [46 Cal.Rptr. 683].)

The diversity of human behavior makes it difficult at times to apply these familiar and sound principles with mathematical precision. A balancing process is inevitably involved. As the culpability of the intervening actor increases and the culpability of the original actor, in comparison, decreases, the balance shifts toward the determination that the former has become the efficient or superseding cause of the injury. Stated another way, the foreseeability required of the original actor decreases as the conduct of the intervening actor progresses from simple negligence to intentional misconduct.

In the case at bar the concept of foreseeability is difficult to apply to Olympic's conduct, which under the circumstances as we have said

amounted to intentional misconduct. Even if Olympic's negligent failure to install additional safety features could be said to have been foreseeable at the time Improved designed, manufactured and sold the machine, once Improved directly notified Olympic of the danger, it had taken the single significant action then available to it and thus should have a right to assume that Olympic would cease to use the machine in its dangerous configuration.

The principles of tort liability serve more than the single purpose of providing compensation to render the injured party whole. They serve to deter misconduct. A concomitant of the deterrent feature is to encourage, or at least not to discourage, actions aimed at preventing injury.

At the time of the discovery of the defect Improved had two options reasonably available. It could have done nothing and stood by hoping for the best, while its liability continued inexorably and indefinitely, or it could have done as it did. To hold this latter course of conduct fruitless would discourage attempts at preventive action in the future.

The key factors in Olympic's conduct that serve to relieve Improved from liability are (1) its knowledge of the defect, and (2) its continued use of the machinery with such knowledge.

*Stultz* v. *Benson Lumber Co.*, 6 Cal.2d 688 [59 P.2d 100], appears to be controlling. There the defendant negligently furnished defective lumber to plaintiff's employer, who used it to build a scaffolding, knowing that the lumber was defective and unsafe for the use to which it was put. This conduct by the employer was held a superseding cause of plaintiff's injury, which terminated defendant's liability.

In our case, Improved furnished defectively designed machinery to the plaintiff's employer, who intentionally continued to use the machinery after having been directly advised that the machinery did not comply with the industrial safety law. The difference between scaffolding and machinery is not such as to alter the legal principle. Both scaffolding and machinery are dangerous to life and limb when they are defectively designed or constructed.

*Rae* v. *California Equipment Co.*, 12 Cal.2d 563 [86 P.2d 352], approved the holding in *Stultz* while distinguishing its facts. The holding in *Stewart* v. *Cox*, 55 Cal.2d 857 [13 Cal.Rptr. 521, 362 P.2d 345], is to the same effect.

Applying this concept to the situation in which Improved found itself upon discovery of the defective design of its machine, compels the hold-

ing that its action in notifying Olympic terminated its liability. Olympic's conduct became the superseding cause of the injury, and the trial court correctly granted a nonsuit in favor of Improved.

The petition of respondent Improved Machinery, Inc. for a hearing by the Supreme Court was denied March 8, 1973.

## Appendix "A"

"November 12, 1963

Olympic Plastics Company, Inc.
3471 So. La Cienega Boulevard
Los Angeles 16, California

Attention: Mr. David Rome
Subject: *IMPCO Ref. SP63-831*
Dear Mr. Rome:

In accordance with your recent discussion with Lyle Burford, we are pleased to quote on up-to-date safety measures for your IMPCO Model HA4-175 machine.

Sliding operating gate with electrical and hydraulic cut-off and with mechanical drop bar, rear gate guard, press guards for IMPCO Model HA4-175 Price . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $500.00

Prices quoted are FOB Nashua, N.H., are firm for prompt acceptance and are exclusive of any existing or future sales or excise taxes. All quotations are subject to the further terms and conditions as set forth on the reverse side of the attached proposal sheet.

Installation no charge.

Terms: Not [*sic*] thirty days.

Shipment: One week from receipt of order.

If you have any questions, please do not hesitate to call Lyle Burford, or upon us at Nashua.

Please refer to IMPCO SP63-831 in any future correspondence pertaining to this quotation.

Very truly yours,
IMPROVED MACHINERY INC.
Sales Manager
Plastic Machinery Sales

FZB:rp
cc: Mr. L. V. Burford
Mr. R. P. Emerson"

## Appendix "B"

"May 28, 1964

Olympic Plastics Co., Inc.
3471 So. La Cienega Blvd.
Los Angeles 16, California
Attention: Mr. John Totten
Dear Mr. Totten:

Our records show that the following machinery is still equipped with a lift type gate rather than the sliding type:

IMPCO Model HA4-175, Serial No. 73042
"        "        "        "    "  73043

Our attention has been called to the 'General Industry Safety Orders', booklet issued by the State of California, Division of Industrial Safety. This is a quotation

from the General Industry Safety Orders promulgated by your State on the subject of equipment on injection molding machines, from which we quote as follows:

'3759. Injection Molding Machine (Class A). Every injection molding machine shall be guarded by any one or more of the following methods: (a) By a *sliding gate* guard so designed and installed that it interposes a barrier between the dies and the operator before the dies can close and shall be so arranged that if the gate can be opened during the die closing cycle the die motion will be immediately stopped or be reversed by the opening of the gate (emphasis supplied).

'The sliding gate guard shall extend over the top and to each side of the dies such a distance as will make it impossible for the operator to place his hands between the dies while they are closing. The danger zone on the side of the machine opposite the operator's working position shall also be guarded.

'(b) By two-handed constant pressure devices or controls which require the simultaneous use of both the operator's hands during the entire die closing cycle.'

To assist you in meeting the requirements of the law we renew the offer which we understand Mr. Burford has discussed with you under which you would be invoiced for $500.00 for parts involved and IMPCO would assume the cost of installation for the changeover to a sliding gate, work to be performed by one of IMPCO's servicemen.

We felt that you would wish to have this matter brought to your attention again in the interest of complying with the State of California orders dealing with safety devices and trust that with this being brought to your attention again, that you will consider it worthy of immediate consideration and take action accordingly to correct the situation.

We enclose a stamped envelope hoping that you will take this opportunity to order the replacement necessary or communicate with us in this connection.

> Very truly yours,
> IMPROVED MACHINERY INC.
> Vice President
> Plastic Machinery Sales

GWW:jf
Enclosure
cc: Mr. L. V. Burford"