[No. B045104. Second Dist., Div. Four. Sept. 20, 1991.]

ALBERTO ORTIZ et al., Plaintiffs and Appellants, v.
HPM CORPORATION et al., Defendants and Respondents.

**[Opinion certified for partial publication.*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II, III B and C, and IV.

180

COUNSEL

Peters & Peters, Barbara J. Peters and Moises Luna for Plaintiffs and Appellants.

Lamb, Morris & Lobello, Curtis W. Morris, James Morris, Murchison & Cumming and Robyn McDonald Schiffman for Defendants and Respondents.

OPINION

**EPSTEIN, J.**—Alberto and Maria Lugo Ortiz appeal from the judgment entered in their action seeking damages for injuries suffered when Mr. Ortiz became trapped in a plastic injection molding machine. Mrs. Ortiz asserts error in the court's granting of a nonsuit on her cause of action for negligent infliction of emotional distress, and claims this error was caused in part by the bifurcation of the trial. Mr. Ortiz challenges the jury's determination that he was 90 percent at fault, asserting that the bifurcation of the trial and improper evidentiary rulings caused this result. Both appellants contend that the trial court erroneously granted a nonsuit in favor of the former owner of the machine, Celanese Corporation. Finally, Mr. Ortiz claims the court should not have granted a credit to defendant HPM Corporation for the workers' compensation benefits paid to Mr. Ortiz by his employer.

In the published portion of this opinion, we conclude that there was sufficient evidence that Mrs. Ortiz personally observed the injury-producing event for that factual determination to have been presented to the jury. We therefore reverse the order granting a nonsuit on her cause of action for negligent infliction of emotional distress. We also conclude that the trial court correctly granted a motion of nonsuit in favor of Celanese on the cause of action for strict liability. In the unpublished portion of the opinion, we find no abuse of discretion in the court's decision to bifurcate the trial, and we conclude that the court properly granted a nonsuit in favor of Celanese on the causes of action for breach of warranty, but find error in the granting of a nonsuit on the cause of action for negligence. We further conclude that HPM should not have received a credit for the workers' compensation benefits paid to Mr. Ortiz.

FACTUAL AND PROCEDURAL SUMMARY

Alberto Ortiz and Maria Lugo Ortiz, husband and wife, both worked for Colonial Engineering. Mr. Ortiz was a foreman in the production depart-

ment, responsible for production and for keeping the plastic injection molding machines running. Mrs. Ortiz was a machine operator.

On November 6, 1983, Mr. and Mrs. Ortiz took a morning meal break together at work. Mr. Ortiz then returned to work. Mrs. Ortiz followed about five minutes later. She noticed that machine No. 11 had stopped working, and went to machine No. 12, where Mr. Ortiz was working, to tell him to fix it. Mrs. Ortiz approached machine No. 12, told Mr. Ortiz that machine No. 11 was not running, and started to walk away. When he did not answer her, Mrs. Ortiz went back to machine No. 12 to see what was going on. She bent down to the machine and saw that Mr. Ortiz was inside the mold area of machine No. 12, pressed between the cylinder and a stationary part of the machine; the machine was still running. Blood was dripping down his arm and his body was limp. Mrs. Ortiz yelled hysterically and summoned help. John Matlock, a maintenance mechanic, freed Mr. Ortiz from the machine and administered cardiopulmonary resuscitation to him. Mr. Ortiz sustained serious injuries in this accident.

Mr. Ortiz brought this action seeking damages for personal injury based on theories of negligence, breach of express and implied warranty and strict liability. Mrs. Ortiz sued for negligent infliction of emotional distress. Named defendants included HPM Corporation, the manufacturer of the machine; Celanese Plastics Company, a division of Celanese Corporation, the original purchaser and user of the machine; KM Industrial Machinery Company, a dealer in used machinery which had purchased the machine from Celanese Corporation; and Colonial Engineering, Mr. Ortiz's employer and the ultimate purchaser of the machine.

Colonial Engineering settled with the plaintiffs and was dismissed from the action prior to the start of trial. On motion of Celanese Corporation, joined by HPM and KM Industrial, and over appellants' objection, the trial was bifurcated. Liability was to be tried first, with the damages phase to follow, if necessary. At the conclusion of plaintiffs' case, the court granted motions for nonsuit brought by Celanese Corporation and KM Industrial. The Supreme Court decision in *Thing* v. *La Chusa* (1989) 48 Cal.3d 644 [257 Cal.Rptr. 865, 771 P.2d 814], was filed during the trial, establishing strict requirements for bystander recovery on the theory of negligent infliction of emotional distress. Based on its reading of that decision, the trial court granted HPM's motion for nonsuit as to Mrs. Ortiz.

The jury returned a verdict on the first phase of the trial, finding negligence on the part of HPM Corporation, but assessing comparative fault of 90 percent to plaintiff Mr. Ortiz and 10 percent to HPM Corporation. The issue of damages was tried to a different jury, resulting in a finding of damages in

the amount of $1.5 million. Judgment was entered against HPM for $150,000, less $69,500 in credits for prior settlements, including $52,000 in workers' compensation benefits. Mr. and Mrs. Ortiz appeal.

DISCUSSION

I

*Nonsuit as to Maria Lugo Ortiz*

Maria Lugo Ortiz asserts error in the court's granting of nonsuit against her on her claim for negligent infliction of emotional distress. She argues that there was circumstantial evidence from which a jury could have determined that she observed the injury-producing event while it was occurring, and so satisfied the requirements of *Thing* v. *La Chusa, supra,* 48 Cal.3d 644. We conclude that her claim has merit.

"Nonsuit may be granted only when there is no evidence to support a verdict in plaintiff's favor. [Citation.] On appeal from a judgment of nonsuit, we accept plaintiff's evidence, indulge in every favorable inference that can be drawn on behalf of plaintiff, and disregard conflicting evidence. [Citation.]" (*Harris* v. *Smith* (1984) 157 Cal.App.3d 100, 104 [203 Cal.Rptr. 541].)

The right of a "bystander" to recover damages for negligent infliction of emotional distress was first recognized in *Dillon* v. *Legg* (1968) 68 Cal.2d 728 [69 Cal.Rptr. 72, 441 P.2d 912]. *Dillon* held that as in other negligence cases, liability exists only where defendant owes a duty to the plaintiff. (*Id.* at p. 740.) "Since the chief element in determining whether defendant owes a duty or an obligation to plaintiff is the foreseeability of the risk, that factor will be of prime concern in every case. Because it is inherently intertwined with foreseeability such duty or obligation must necessarily be adjudicated only upon a case-by-case basis." (*Id.* at p. 740.) The court declined to define that obligation, choosing instead to provide guidelines to aid courts in determining reasonable foreseeability of the harm in each case. (*Ibid.*) Courts were instructed to "take into account such factors as the following: (1) Whether plaintiff was located near the scene of the accident as contrasted with one who was a distance away from it. (2) Whether the shock resulted from a direct emotional impact upon plaintiff from the sensory and contemporaneous observance of the accident, as contrasted with learning of the accident from others after its occurrence. (3) Whether plaintiff and the victim were closely related, as contrasted with an absence of any relationship or the presence of only a distant relationship." (*Id.* at pp. 740-741.)

The case-by-case application of the *Dillon* guidelines produced widely inconsistent rulings in the lower courts, and finally, in *Thing* v. *La Chusa, supra,* the Supreme Court sought to resolve the uncertainties which had long troubled courts and litigants as to the right of a "bystander" to recover for emotional distress caused by knowledge of an injury to a third person. After tracing the evolution of this theory of recovery, the court concluded that "a plaintiff may recover damages for emotional distress caused by observing the negligently inflicted injury of a third person if, but only if, said plaintiff: (1) is closely related to the injury victim; (2) is present at the scene of the injury-producing event at the time it occurs and is then aware that it is causing injury to the victim; and (3) as a result suffers serious emotional distress—a reaction beyond that which would be anticipated in a disinterested witness and which is not an abnormal response to the circumstances." (48 Cal.3d at pp. 667-668, fns. omitted.)

The court explained the basis for the requirement of contemporaneous observation, the factor at issue in this case: "The impact of personally observing the injury-producing event in most, although concededly not all, cases distinguishes the plaintiff's resultant emotional distress from the emotion felt when one learns of the injury or death of a loved one from another, or observes pain and suffering but not the traumatic cause of the injury. Greater certainty and a more reasonable limit on the exposure to liability for negligent conduct is possible by limiting the right to recover for negligently caused emotional distress to plaintiffs who personally and contemporaneously perceive the injury-producing event and its traumatic consequences." (48 Cal.3d at p. 666.)

The evidence at trial was that Mrs. Ortiz discovered her husband trapped in the plastic injection molding machine. The air cylinder was pressing across his chest, pinning him against the stationary platen of the machine. His head was caught in a downward position just on the other side of the cylinder. The machine was still running at that time; its pressure system was on, and it was exerting pressure on Mr. Ortiz, particularly across his chest. Mr. Ortiz was in that condition, being pressed by the machine, when Mrs. Ortiz saw him. Mrs. Ortiz was the individual who summoned help.

In order to free Mr. Ortiz from the machine, maintenance mechanic John Matlock went to the back of the machine and shifted the cylinder so the machine could be opened manually. Mr. Ortiz was released from the machine and his body fell onto the chute.

While Mr. Ortiz was trapped in the machine, his skin was extremely discolored and he did not appear to be breathing at all. His body was limp and blood was flowing from his left arm. This evidence supports the

inference that Mr. Ortiz was being deprived of oxygen during the time his wife saw him pressed in the machine.

This case is clearly distinguishable from the situation in *Thing*, where the mother was told by her daughter that her son had been hit by a car. Mrs. Thing rushed to the scene, where she saw her son, bloody and unconscious. She did not contemporaneously observe the injury-producing event. She learned about it from another person. By the time she arrived, the event was over and only the consequences were observable. (48 Cal.3d at p. 669.)

In a footnote in *Ochoa* v. *Superior Court* (1985) 39 Cal.3d 159 [216 Cal.Rptr. 661, 703 P.2d 1], quoted with approval in *Thing*, the court explained why contemporaneous observation of an accident merits different treatment: "[A] distinction between distress caused by personal observation of the injury and by hearing of the tragedy from another is justified because compensation should be limited to abnormal life experiences which cause emotional distress. While receiving news that a loved one has been injured or has died may cause emotional distress, it is the type of experience for which in a general way one is prepared, an experience which is common. By contrast few persons are forced to witness the death or injury of a loved one or to suddenly come upon the scene without warning in situations where tortious conduct is involved. In the present case, for example, while it is common to visit a loved one in a hospital and to be distressed by the loved one's pain and suffering, it is highly uncommon to witness the apparent neglect of the patient's immediate medical needs by medical personnel." (*Id* at p. 165, fn. 6.)

In this case, as in *Ochoa*, the injury-producing event continued for a period of time, and the plaintiff personally observed the event while it still was occurring. We do not believe that the bright line drawn in *Thing* v. *La Chusa* was intended to deny recovery to a plaintiff who personally observes an injury-producing event in progress. The limitation, instead, excludes those plaintiffs who come upon the scene *after* the event, and whose observation is solely of the consequences of the occurrence. (See, e.g., *Hathaway* v. *Superior Court* (1980) 112 Cal.App.3d 728 [169 Cal.Rptr. 435], where recovery was denied to parents who came upon their child one minute after he received an electrical charge, since they observed only the dreadful consequences of the accident, not the accident itself; and *Parsons* v. *Superior Court* (1978) 81 Cal.App.3d 506 [146 Cal.Rptr. 495, 5 A.L.R.4th 826], where recovery was denied to a mother and father who, while driving in the same direction as their daughters, came upon the wreckage of their daughters' car "before the dust had settled" and found their mangled bodies, already dead or dying.)

Respondent HPM argues that if oxygen deprivation is the permanent injury suffered by Mr. Ortiz, it could not be perceived and therefore does not meet the requirement of *Thing* that the witnesses to the injury-causing event must be aware that it is causing injury to the victim. (*Thing* v. *La Chusa, supra,* 48 Cal.3d at p. 668.) In *Golstein* v. *Superior Court* (1990) 223 Cal.App.3d 1415 [273 Cal.Rptr. 270], upon which respondent relies, the victim's parents did not witness the injury-causing event, an excessive radiation dosage during cancer treatment, and also were unaware at the time that it was causing injury. The court interpreted *Thing* v. *La Chusa* as requiring that "plaintiffs experience a contemporaneous sensory awareness of the causal connection between the negligent conduct and the resulting injury." (*Golstein* v. *Superior Court, supra,* 223 Cal.App.3d at p. 1427.) Since the fatal dosage of radiation was not a visible injury at the time of its occurrence, and since the parents were unaware of its injurious nature at the time it occurred, the court held that the parents could not proceed on a bystander theory for negligent infliction of emotional distress.

Unlike the parents in *Golstein*, Mrs. Ortiz saw the occurrence which caused her husband injury, and she was fully aware that he was being injured. Even if she could not "perceive" the full extent of the damage resulting from oxygen deprivation, she was clearly aware that his body was limp, that blood was running down his arm, and that he did not respond when she spoke to him.

This evidence would have justified a jury in finding that the injury-producing event was still occurring at the time Mrs. Ortiz discovered Mr. Ortiz trapped in the machine, and that she was then aware that it was causing injury to him, so as to meet the contemporaneous observation requirement for a claim of negligent infliction of emotional distress. The trial court therefore erred in granting a nonsuit on Mrs. Ortiz's cause of action for negligent infliction of emotional distress.

## II

*Bifurcation of Trial**

*See footnote, *ante,* page 178.

## III

### Nonsuit as to Celanese

Appellants assert that the court erred in granting a nonsuit in favor of Celanese as to the claims for strict products liability, breach of express and implied warranty, and negligence. We consider these claims in that order.

### A

■ It is settled in California that "A manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being." (*Greenman* v. *Yuba Power Products, Inc.* (1963) 59 Cal.2d 57, 62 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049].) "The purpose of strict liability is to 'insure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves.' [Citations.]" (*Fortman* v. *Hemco, Inc.* (1989) 211 Cal.App.3d 241, 251 [259 Cal.Rptr. 311].) ■ Under the stream of commerce approach followed in California, "strict liability in tort has been applied not only to manufacturers but to the various links in the commercial marketing chain" including retailers, wholesale-retail distributors, personal property lessors and bailors, and licensors of personalty. (*Becker* v. *IRM Corp.* (1985) 38 Cal.3d 454, 459 [213 Cal.Rptr. 213, 698 P.2d 116].)

As explained in the Restatement Second of Torts, the rule of strict liability "applies to any person engaged in the business of selling products for use or consumption. It therefore applies to any manufacturer of such a product, to any wholesale or retail dealer or distributor, and to the operator of a restaurant. It is not necessary that the seller be engaged solely in the business of selling such products. . . . [¶] The rule does not, however, apply to the occasional seller of food or other such products who is not engaged in that activity as a part of his business. . . . This Section is also not intended to apply to sales of the stock of merchants out of the usual course of business, such as execution sales, bankruptcy sales, bulk sales, and the like." (Rest.2d Torts, § 402A, com. f.)

While our Supreme Court has diverged from the Restatement Second of Torts as to some aspects of strict liability, it has expressed agreement with comment f of section 402A, by holding that strict liability does not apply to isolated transactions, but rather to sellers "found to be in the business of manufacturing or retailing." (*Price* v. *Shell Oil Co.* (1970) 2 Cal.3d 245, 254 [85 Cal.Rptr. 178, 466 P.2d 722].)

 Celanese established at trial that it was not "in the business of selling" plastic injection molding machines. It successfully asserted that its one-time sale of the machines when it closed its Santa Ana operation rendered it merely an "occasional seller," not subject to strict products liability. Support for this position is found in *Balido* v. *Improved Machinery, Inc.* (1972) 29 Cal.App.3d 633 [105 Cal.Rptr. 890]. In that case, Paper Mate Manufacturing Company purchased a plastic injection molding press from a manufacturer and used it in its operations. Paper Mate later sold the press to Olympic Plastics Company. Olympic's employee, Balido, was injured by the press and sued her employer, the manufacturer, and the intermediate owner, Paper Mate. The court upheld the granting of a nonsuit in favor of Paper Mate on the strict liability claim: "On strict liability, there was nothing to suggest that Paper Mate was a conduit for the production or distribution of [the manufacturer's] presses. Paper Mate was no more than a one-time 'occasional seller' who does not become subject to strict liability for manufacturing or design defects." (*Id.* at pp. 639-640; disapproved on other grounds in *Cronin* v. *J.B.E. Olson Corp.* (1972) 8 Cal.3d 121 [104 Cal.Rptr. 433, 501 P.2d 1153], as explained in *Foglio* v. *Western Auto Supply* (1976) 56 Cal.App.3d 470, 476 [128 Cal.Rptr. 545].)

A similar conclusion, that an intermediate owner of equipment was not "in the business of selling equipment" for purposes of strict liability, was reached in *Daniels* v. *McKay Machine Co.* (7th Cir. 1979) 607 F.2d 771. In that case, the evidence established that Dow Chemical Company installed a piece of equipment known as a hot shear in its manufacturing plant, and modified it three times during a sixteen-year period of use. Dow leased and later sold its plant and equipment, including the hot shear machine, to another corporation, Conalco. One of Conalco's employees was injured while using the hot shear machine. On appeal, the court affirmed summary judgment in favor of Dow on the employee's cause of action for strict products liability. The evidence established that Dow was not in the business of manufacturing or selling hot shears, and that the sale of the hot shear line "was a one-time isolated sale of manufacturing equipment which had been installed on Dow's premises, which sale was included in the sale of Dow's entire manufacturing facility at said location." Since Dow was not "in the business of selling" the equipment, its one-time, isolated lease or sale of the equipment did not subject it to strict liability. (*Id.* at pp. 775-776; see also *Bruce* v. *Martin-Marietta Corp.* (10th Cir. 1976) 544 F.2d 442, 448-449.)

*Santiago* v. *E.W. Bliss Div.* (1985) 201 N.J.Super. 205 [492 A.2d 1089, 1097-1099] contains a thorough treatment of the question of when an intermediate seller of used equipment is "in the business of selling" for purposes of strict liability. The court held that "the disposal of a product such

as, in this case, a punch press, by a consumer after 23 years of use, does not constitute the consumer as being in the 'business of selling' as a manufacturer, seller, distributor, retailer or supplier subject to strict liability pursuant to *Restatement, supra*, § 402A(1). Rather, such a seller of a second-hand product is merely an 'occasional seller' of an isolated sale of discarded equipment and not engaged in the activity of selling the product as part of its business." (*Id.* at p. 1100.)

In this case, too, the evidence showed that the intermediate seller, Celanese, used the plastic injection molding machines in its own operation for several years, and then engaged in a one-time sale of this used equipment at the time it shut down its Southern California operating facility. There was no evidence demonstrating that Celanese was "in the business of selling" plastic injection molding machines.

Appellants argue, however, that Celanese made extensive modifications to the machines and should therefore be considered a remanufacturer subject to strict liability. A seller of used goods who makes extensive modifications to a product prior to sale has been considered "tantamount to a manufacturer" subject to strict liability. (*Green* v. *City of Los Angeles* (1974) 40 Cal.App.3d 819, 838 [115 Cal.Rptr. 685].) *Green* involved an extreme situation, where the intermediate owner rebuilt and completely changed a crane, and ultimately sold it with a warranty that it was in "like new" condition. The trial court's detailed findings as to the owner's total refabrication of the crane, unchallenged on that appeal, justified its decision to consider that particular owner as a manufacturer.

The evidence at trial in this case was that when it purchased the machine from HPM, Celanese specified certain modifications to the original design and specified that it be capable of utilizing particular dies; that it modified the front safety gate guarding the mold area, moving it outward from the center of the machine, thereby increasing the unguarded area surrounding the machine; that it further modified the safety gate so that the distance from the floor to the bottom of the gate was three inches greater than the original distance; and that it changed the rear safety gate as well. Celanese made these modifications in order to accommodate its particular large dies. This evidence falls far short of the virtual redesign and reconstruction of the crane in *Green* which supported treating the intermediate owner as a manufacturer.

More relevant are the cases considering whether an employer should be subjected to strict liability under the dual capacity doctrine when an employee is injured on a machine created by the employer for use in its own

plant.[2] For example, in *Shook* v. *Jacuzzi* (1976) 59 Cal.App.3d 978 [129 Cal.Rptr. 496], two employees were injured while operating a machine used by the employer in its manufacture of wheels. Both received workers' compensation benefits, but also sought to recover in a civil action for strict liability, alleging that the machine was defectively designed and manufactured by the employer and a third party. The court held that the employer was not liable on a products theory, since it had created the machine exclusively for its own use in its own plant and premises, and did not sell the machine or place it in the stream of commerce. "Rather, it was but an occasional or casual manufacturer, and thus not subject to strict liability [citations]. Its design and construction of this machine was but auxiliary to its principal manufacturing operation." (*Id.* at p. 981.)

In *Douglas* v. *E. & J. Gallo Winery* (1977) 69 Cal.App.3d 103 [137 Cal.Rptr. 797], the court held the employer subject to strict liability on a dual capacity theory where the product which caused the employee's injury was one the employer also manufactured and sold to the public. The holding was expressly limited "to a defendant who engages in manufacturing for sale to the general public. A single or occasional disconnected act does not constitute engaging in such manufacturing. . . . The proper standard for determining whether a defendant is engaged in manufacturing so as to make applicable the manufacturers' liability imposed hereunder is the exercise of judgment on a case by case basis to decide if the manufacturing by the particular defendant is such as to justify the conclusion that it is part and parcel of an activity which occupies the effort, attention and time of the defendant for the purpose of possible profit on a continuing basis." (*Id.* at p. 113.)

Indulging every favorable inference on behalf of appellants, as we are required to do in light of the nonsuit posture of the case (*Harris* v. *Smith, supra,* 157 Cal.App.3d 100, 104), we find no substantial evidence that Celanese was engaged "in the business of" manufacturing plastic injection machines or the dies used with them.[3] At best, the evidence showed that Celanese was an occasional or casual manufacturer, and as such was not subject to strict liability. (See *Shook* v. *Jacuzzi, supra,* 59 Cal.App.3d 978,

---

[2]The Supreme Court has recognized the need for consistency between application of general products liability law and application of the dual capacity doctrine against an employer: "By interpreting the workers' compensation law in harmony with product liability doctrine, a manufacturer will not escape liability to its employees for defective products where there would be liability to any other injured person." (*Bell* v. *Industrial Vangas, Inc.* (1981) 30 Cal.3d 268, 278 [179 Cal.Rptr. 30, 637 P.2d 266].)

[3]Even if appellants had been able to establish that Celanese made the dies, such manufacture for its own use in its own plant would not have placed it "in the business of" manufacturing for sale to the public. (See *Williams* v. *State Compensation Ins. Fund* (1975) 50 Cal.App.3d 116, 120 [123 Cal.Rptr. 812].)

981.) The nonsuit was properly granted as to the strict liability cause of action against Celanese.

## III B-IV*

. . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment of nonsuit against Mrs. Ortiz is reversed, the judgment of nonsuit in favor of Celanese on the cause of action for negligence is reversed, and the credit against the verdict in the amount of $52,000 is stricken from the judgment. In all other respects, the judgment is affirmed. Appellants are to recover their costs on appeal.

Woods (A. M.), P. J., and Cooper, J.,† concurred.

Respondents' petition for review by the Supreme Court was denied December 12, 1991.

---

*See footnote, *ante*, page 178.

†Judge of the Municipal Court for the Los Angeles Judicial District sitting under assignment by the Chairperson of the Judicial Council.