[No. B221096. Second Dist., Div. Seven. Apr. 18, 2011.]

ELIAS GARCIA, Plaintiff and Appellant, v.
BECKER BROS. STEEL CO., et al., Defendants and Respondents.

Counsel

Blumberg Law Corporation, John Blumberg and Ave Buchwald for Plaintiff and Appellant.

Inglis, Ledbetter & Gower, Gregory J. Bramlage, Steven K. Ledbetter; Robert A. Lisnow; Lascher & Lascher, Wendy C. Lascher and Eric R. Reed for Defendants and Respondents.

Opinion

WOODS, J.—

## INTRODUCTION

In 1973, the defendant bought "slitter line" machinery for use in operating its steel business. After 26 years, the defendant sold the slitter line to another company. After that company ceased operations, the equipment was repossessed by the bank and then bought by the plaintiff's employer. In 2004, the plaintiff was injured and sued the machine's original owner for negligence and "wanton, reckless and conscious disregard of safety," but the original owner moved for summary judgment, arguing it owed the plaintiff no duty. The trial court granted the summary judgment motion, and the plaintiff appeals. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

In October 2004, in the course of his employment at Lexwest, Elias Garcia was injured while using a machine on a "slitter line" manufactured by Cincinnati Incorporated and owned by his employer.[1] As a result, his left index finger was amputated.

The original slitter line was sold to Becker Bros. Steel Supply Company in 1973, and Becker Bros. operated the line for 26 years.[2] In 1984, the Shama

---

[1] The line was comprised of several machines. One component machine cut a roll of steel into two or more sections which would then be fed into another component machine (a "recoiler") which caused the now slit steel to be wound into two or more new rolls.

[2] In 1974, the California Occupational Safety and Health Administration (Cal/OSHA) promulgated the following provision: "Hazardous revolving or reciprocating parts in any machine not guarded by the frame of the machine or by location shall be guarded." (See Cal. Code Regs., tit. 8, § 4002, subd. (a).)

Partnership, predecessor to Shama LLC, purchased an additional component machine (a "tension stand" or "tensioner") and added it to the slitter line operated by Becker Bros.[3]

In 1999, Becker Bros./Shama LLC sold the slitter line to Columbia Steel LLC. During the 26 years Becker Bros. operated the slitter line, it slit approximately 10 to 12 steel rolls each eight-hour working day, five days per week, for a conservative estimate of 65,000 total times. During that time, there was one injury at the same location on the recoiler. That worker lost the tip of his finger.

By March 2001, Columbia Steel LLC had ceased doing business, the Cincinnati Incorporated slitter line was repossessed by the bank, and Garcia's employer (Lexwest) purchased it, assuming the lease of the building owned by Shama LLC and operating the slitter line at the same location. After 1999, there were no injuries at the location other than Garcia's.

Garcia's work-related injury was investigated by Cal/OSHA engineer Miguel Vargas, who issued a citation to Lexwest for violation of California Code of Regulations, title 8, section 4002 (Moving Parts of Machinery or Equipment) in January 2005.[4] According to the citation, "On 10/14/04, a slitter operator helper was finishing up a metal coil. At the end of the coil the operator assistant was handling the end of [the] metal strap [sic] being coiled as he was jogging the re-coiler forward. He noticed that the metal strip being coiled was moving in an oscillating motion; therefore, he placed his gloved left hand on top of the metal strip in order to stop the motion and his left hand was pulled into the nip point created by the re-coiler guide and the newly formed coil severing his left index finger and degloving his left middle finger. The area between the re-coiler guide and the side of the coil present a squeezing hazard to employees, and was not guarded by the frame of the machine or by location in a manner which would prevent inadvertent contact with the hands of the operator's helper."

In responding to the citation, Lexwest's former vice-president of operations (William Huyser) asserted it was not possible to place a guard on the recoiler and still operate the machine. Cal/OSHA determined Lexwest had abated the

---

[3] Becker Bros. and Shama were and are separate business entities. Warren Becker and Sheldon Becker are both principals of both Becker Bros. and Shama and operated the businesses on a day-to-day basis. Becker Bros. operated the steel processing business; Shama owned the land, building and machines. Further references in this opinion to "Becker Bros." mean "Becker Bros. and Shama LLC" unless the opinion otherwise distinguishes them.

[4] As amended in 1982, subdivision (a) of section 4002 states: "All machines, parts of machines, or component parts of machines which create hazardous revolving, reciprocating, running, shearing, punching, pressing, squeezing, drawing, cutting, rolling, mixing or similar action, including pinch points and shear points, not guarded by the frame of the machine(s) or by location, shall be guarded." (Cal. Code Regs, tit. 8, § 4002, subd. (a).)

California Code of Regulations, title 8, section 4002 violation in two ways: (1) by relocating the buttons on the overarm of the recoiler so the operator had to have both hands on the buttons when jogging the recoiler and (2) by adopting five safety procedure rules addressing when workers could be near the recoiler; Lexwest was not required to and did not put a guard on the recoiler. Garcia filed a complaint against the manufacturer of the slitter line (Cincinnati Incorporated), asserting negligence and strict liability claims relating to the slitter line as a defective product.[5] Three years later, Garcia amended his complaint to add Becker Bros. and Shama LLC as defendants. As to these defendants, Garcia added a sixth cause of action for "wanton, reckless and conscious disregard of safety."[6]

According to the allegations of his first amended complaint, on February 6, 1976, Cincinnati Incorporated sent Becker Bros. a written notice stating the American National Standards Institute (ANSI) was in the process of finalizing machine safety standards for the slitter line, recommending that Becker Bros. "take immediate steps to provide safeguarding for your equipment if you have not already done so," which included guarding the recoiler to prevent accidental entry of body parts as described in the enclosed draft standards, but Becker Bros. made no modifications.

On January 31, 1980, Garcia alleged, Cincinnati Incorporated sent Becker Bros. specifications for a warning sign to be affixed to the recoiler, recommending the use of a "snubber" to control the tension of the rewound steel that could otherwise cause a "clockspring" effect endangering workers when the steel was pulled through the recoiler when the rewound steel roll expanded, even though power to the recoiler was turned off, but Becker Bros. did not use a snubber on the recoiler.

On July 20, 1983, Garcia further alleged, Cincinnati Incorporated sent Becker Bros. a written notice stating the ANSI had finalized and published safety standards for the slitter line and enclosed a copy which included the requirement that there must be a guard to prevent a worker's hands from making contact with areas where there was a squeeze, pinch, and shear hazard. Although the recoiler had a squeeze and pinch hazard, Becker Bros. made no modifications. In 1985, Cincinnati Incorporated again sent specifications for the warning sign recommending use of a snubber device on the recoiler, but Becker Bros. did not use a snubber on the recoiler. In the 1980's, Garcia alleged, a Becker Bros. employee suffered the partial amputation of a

---

[5] Garcia also named as defendants the various health care providers who treated him for the injuries he suffered on the slitter line, asserting medical malpractice and negligence claims against these defendants.

[6] Garcia filed a nonopposition to Becker Bros.'s and Shama's demurrer to Garcia's strict liability claim as to these defendants.

thumb because of the absence of any safety devices mandated by the ANSI standards, but Becker Bros. made no modifications thereafter.

In 1984, Garcia alleged, Becker Bros. modified the slitter line by adding a component machine which had not been a part of the Cincinnati Incorporated transaction. When Becker Bros. and its alter ego Shama LLC sold the slitter machine components to Columbia Steel in 1999, Garcia alleged, both Becker Bros. and Shama knew the slitter machine—particularly the recoiler—posed an unreasonable danger to workers because (1) there was no snubber to control the tension of the steel as the end of the roll left the slitter, and (2) there was no guard on the recoiler to prevent the worker's hands from entering the pinch point, in violation of ANSI Standard 5.1.1.1(1) and California Code of Regulations, title 8, section 4002, but Becker Bros. and Shama sold the machinery to Columbia Steel without informing the buyer of these defects. After Columbia Steel ceased doing business as of 2001 and the machinery was repossessed by the bank and purchased by Lexwest which assumed the lease of the building owned by Becker and Shama, neither Becker Bros. nor Shama informed Lexwest of the defects or of the written notices concerning worker safety received from Cincinnati Incorporated in 1976 and 1983.

According to Garcia, his injuries suffered on October 14, 2004, would not have occurred had there been a snubber and/or guard on the recoiler. Becker Bros. and Shama acted with oppression and a conscious, deliberate disregard for the safety of workers employed by them and subsequently by Columbia Steel and then Lexwest who were operating machinery located in Becker Bros./Shama's building and installed by them without safety modifications.

Becker Bros. and Shama moved for summary judgment or adjudication, arguing they owed Garcia no duty on this record. According to Garcia, he was injured when one of the slit rolls that had already been cut started to come undone. He grabbed the end of the roll and his hand was drawn into the "blade," meaning the "separators on the overarm separator attached to the recoiler." Cal/OSHA investigator Vargas testified at his deposition that "it is the employer's responsibility to ensure that a machine is safeguarded, to abate hazards and to prevent exposure of employees to those hazards"; the ANSI standards played no part in any of his conclusions.

In addition, Becker Bros. presented the testimony of Cincinnati Incorporated's expert (Donald Wandling) opining the recoiler could not be guarded to prevent the type of accident Garcia suffered. Further, according to the declarations of Warren Becker and Sheldon Becker, neither remembered receiving any of the correspondence referenced in Garcia's complaint, and, regarding the 1983 correspondence, Becker Bros. had moved to a new

location as of 1981. Neither Warren Becker nor Sheldon Becker remembered receiving any correspondence from Cincinnati Incorporated after 1981 and neither recognized the signature on the post office return receipt attached to the letter purportedly sent in 1983.

Garcia filed opposition, supported by his own expert's declaration. According to Richard Chandler, the slitter line on which Garcia was injured (1) lacked a guard that would prevent a person from being injured, (2) lacked a mechanism such as a snubber that would prevent the steel from moving through the separator arm on the recoiler when the machinery was in neutral or idle mode, and (3) lacked a two-hand push button jogging system that would keep an operator's hands away from the moving machinery; "[a]ll of these components could have been economically designed and installed prior to 1999." Based on Chandler's inspection, he testified, the machine, particularly the overarm separator, was the type of machine referenced in section 4002 of title 8 of the California Code of Regulations, but it was not guarded by the frame of the machine, or by location, or in any other way. Based on Garcia's account of how his injury occurred, Chandler opined the steel moved through the overarm separator because of the clockspring forces of the recoiled steel, and the resulting movement of the steel would have been prevented by an adequate hold-down device such as a snubber. Even crediting the witness's version of how Garcia's injury occurred (that when Garcia pushed the jog button with one hand, his other hand was drawn into the overarm separator), Chandler testified, the machine's configuration allowing this to occur violated safety standards. According to Chandler, a well-known guarding method employs a device such as a two-hand push button system that requires both of the operator's hands to activate the machine and therefore prevents one hand from being near danger when the machine is jogged; a barrier guard would have prevented an injury like Garcia's by keeping his fingers away from the nip or pinch point of the overarm separator, even in the absence of a two-hand push button system.

Both Garcia and Becker Bros. filed evidentiary objections. After taking the matter under submission, the trial court granted Becker Bros.'s motion for summary judgment, ruling as follows: "The case law does not support liability on a theory of negligence or strict liability. Defendants are not manufacturers nor did they have a duty to prevent the harm that occurred to plaintiff while he was working for a third party, Lexwest (SSUF [undisputed fact] 25 & 26). The court finds that defendants could not have foreseen the harm to the plaintiff. The recoiler could not be guarded to prevent the type of accident that occurred to plaintiff (SSUF 41). The cases cited by plaintiff do not support liability for negligence. Plaintiff cites products liability cases, including the case plaintiff cited in closing argument, namely *Ortiz v. HPM Corp.* (1991) 234 C[al].A[pp].3d 178 [285 Cal.Rprt. 728] . . . . Defendant is only an

'occasional seller' and not subject to strict liability." Judgment was subsequently entered in Becker Bros.'s favor.

Garcia appeals.

## DISCUSSION

*Whatever Duty an Occasional Seller of Used Machinery May Owe Its Immediate Purchaser, the Occasional Seller Owes Subsequent Users Beyond the Immediate Purchaser No Duty to Warn of the Risk of Using the Equipment Sold.*

■ Under California law, " 'A *manufacturer* is *strictly liable* in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being.' [Citation.] 'The purpose of strict liability is to "insure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves." [Citations.]' [Citation.] Under the stream of commerce approach followed in California, 'strict liability in tort has been applied not only to manufacturers but to the various links in the commercial marketing chain' including retailers, wholesale-retail distributors, personal property lessors and bailors, and licensors of personalty. [Citation.]" (*Ortiz v. HPM Corp.* (1991) 234 Cal.App.3d 178, 187 [285 Cal.Rptr. 728], italics added (*Ortiz*).)

As Garcia necessarily concedes, however, because an "occasional seller" of used equipment is not a conduit for the production or distribution of that product, an occasional seller—such as Becker Bros.—is *not* subject to *strict liability* for its sale of a defective product under California law. (*Balido v. Improved Machinery, Inc.* (1972) 29 Cal.App.3d 633, 639–640 [105 Cal.Rptr. 890]; *Ortiz, supra,* 234 Cal.App.3d at pp. 187–188.) Nevertheless, citing these strict liability cases among others, Garcia says even the occasional seller of a used product may owe a duty of care to "those whom the seller should expect could be injured by its subsequent use" although these California cases "declined the opportunity to rule on these issues." In his reply, he says, the duty is a "duty of disclosure [imposed] on the occasional seller of used industrial machinery which can cause serious harm."

■ As our Supreme Court recently reiterated in *Cabral v. Ralphs Grocery Co.* (2011) 51 Cal.4th 764 [122 Cal.Rptr.3d 313, 248 P.3d 1170] (*Cabral*), "The general rule in California is that '[e]veryone is responsible . . . for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property or person . . . .' (Civ. Code, § 1714, subd. (a).) In other words, 'each person has a duty to use ordinary

care and "is liable for injuries caused by his failure to exercise reasonable care in the circumstances . . . ." ' (*Parsons v. Crown Disposal Co.* (1997) 15 Cal.4th 456, 472 [63 Cal.Rptr.2d 291, 936 P.2d 70], quoting *Rowland v. Christian*[ (1968)] 69 Cal.2d [108,] 112 [70 Cal.Rptr. 97, 443 P.2d 561] (*Rowland*).) In the *Rowland* decision, this court identified several considerations that, when balanced together, may justify a departure from the fundamental principle embodied in Civil Code section 1714: 'the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved.' (*Rowland*, [*supra*, 69 Cal.2d] at p. 113; accord, e.g., *Castaneda v. Olsher* [(2007)], 41 Cal.4th [1205,] 1213; *John B. v. Superior Court* (2006) 38 Cal.4th 1177, 1192 [45 Cal.Rptr.3d 316, 137 P.3d 153]; *Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 477 [110 Cal.Rptr.2d 370, 28 P.3d 116]; *Parsons v. Crown Disposal Co., supra,* 15 Cal.4th at p. 473.) As we have also explained, however, in the absence of a statutory provision establishing an exception to the general rule of Civil Code section 1714, courts should create one only where 'clearly supported by public policy.' (*Rowland*, [*supra*, 69 Cal.2d] at p. 112; accord, *John B.,* [*supra*, 38 Cal.4th] at p. 1191; *Merrill v. Navegar,* [*supra*, 26 Cal.4th] at p. 477.)" (*Cabral, supra,* 51 Cal.4th at p. 771, fn. omitted.)

■ The *Cabral* court noted "an important feature of the analysis: the *Rowland* factors are evaluated at a relatively broad level of factual generality. Thus, as to foreseeability, we have explained that the court's task in determining duty 'is not to decide whether a particular plaintiff's injury was reasonably foreseeable in light of a particular defendant's conduct, but rather to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed . . . .' " (*Cabral, supra,* 51 Cal.4th at p. 772, citations & italics omitted.) "By making exceptions to Civil Code section 1714's general duty of ordinary care only when foreseeability and policy considerations justify a categorical no-duty rule, we preserve the crucial distinction between a determination that the defendant owed the plaintiff no duty of ordinary care, which is for the *court* to make, and a determination that the defendant did not breach the duty of ordinary care, which in a jury trial is for the *jury* to make." (*Ibid.*, original italics.) "To base a duty ruling on the detailed facts of a case risks usurping the jury's proper function of deciding what reasonable prudence dictates under those particular circumstances." (*Id.* at p. 774.)

The scope of the duty Garcia seeks to impose is something of a moving target. In his opening brief, relying on non-California authority, Garcia asserted, "The scope of the duty imposed on the seller of a used machine which can amputate a part of the user's body . . . encompasses not only a duty to provide adequate warning, but also a duty to exercise reasonable care to make the machine safe for the use for which it is supplied." "Professor Dobbs explains: 'Some warnings will predictably fail to induce better safety. A warning to a worker not to place his hands in the operating area of a machine will predictably fail to protect all workers all of the time because fatigue, repetitive work, and other elements make it almost certain that some workers will be harmed. If a reasonably priced safety device could have been built into the product, the product is defective in design. In such cases even the best warning does not remedy the design defect.' (Dobbs, The Law of Torts (2001), § 3663, p. 1005.) Thus, . . . section 4002, subdivision (a), which was in effect when [Becker Bros.] sold the slitter in 1999, required that such hazardous machines be guarded to prevent serious injuries such as amputations."

This argument brings us full circle to the fact that, under well-established California law, the occasional seller of used equipment is *not strictly* liable for its sale of a defective product. To the extent Garcia is essentially seeking to hold Becker Bros. liable for its mere position in the chain of ownership of the slitter machinery under the heading of something other than strict liability, he finds no support in California law.

In his reply, however, Garcia argues, an occasional seller of used machinery which can cause serious harm owes a "duty of disclosure." More particularly, he says, Becker Bros. "had the duty to inform the buyer (a) of the notices received from the manufacturer regarding the defect, (b) of the prior accident and (c) of its failure to have undertaken any corrective action."[7] As framed by the allegations of Garcia's complaint, we take the issue presented in this case to be whether an occasional seller of used machinery owes such a duty of disclosure to buyers "downstream from" or beyond its immediate purchaser.

As in *Cabral*, we examine the first three related considerations identified in *Rowland*: " 'the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, [and] the closeness of the connection

---

[7] As for the "buyer" to whom Garcia refers, he sometimes specifies Columbia Steel as the buyer Becker Bros. should have informed (as, Garcia asserts, Columbia Steel would have modified the slitter line to prevent the injury he sustained), but also says Becker Bros. had a duty to inform Lexwest directly, and he makes no mention of the significance of the bank's intervening repossession of the equipment or its duty to pass along any notice or make equipment modifications.

between the defendant's conduct and the injury suffered . . . .' " (*Cabral, supra,* 51 Cal.4th at p. 774.) First, the fact of Garcia's injury is undisputed, and in the "generalized sense of foreseeability pertinent to the duty question," we assume it is foreseeable in the broadest sense that if a subsequent user of machinery does not follow recommended safety precautions to be taken with that machinery, injury may occur. However, in considering the closeness of the connection between defendant's conduct and the injury suffered, Garcia's argument falls short. (*Id.* at p. 775.)

As the trial court inquired at the hearing on the summary judgment motion, "[H]ow about the fact that it's two owners removed? In other words, what should defendants have done? Should they have advised the people they sold [the machine] to, [']Hey, we've had [an] accident with this, and you should be careful or you should put a snubber on it,['] in which case, then, does that liability get transferred to the next owner[? H]ow far down the line do we go?"

Assuming the slitter line was defective, Becker Bros. did not manufacture or design it. Rather, Becker Bros. bought the equipment from Cincinnati Incorporated in 1973, and used the machinery in its operations for another 26 years, with one injury occurring in the 1980's. Then, in 1999, Becker Bros. sold the equipment to Columbia Steel. As of March 2001, Columbia Steel had ceased doing business and the bank repossessed the slitter line machinery. Garcia's employer Lexwest then purchased the equipment, and in October 2004 (about 20 years after the injury sustained by a Becker Bros. employee and about five years after Becker Bros.'s sale of the equipment), Garcia was injured while working on the slitter line in the course of his employment at Lexwest.

According to Garcia, the slitter line was defective when it left Becker Bros.'s control, and despite receiving warnings from Cincinnati to safeguard the equipment to prevent accidental entry of body parts, Becker Bros. "chose not to make any modifications," and "did not inform Lexwest of the defects" in the slitter line "nor of the written notice concerning worker safety received from Cincinnati [I]ncorporated in 1976 and 1983," and he was injured as a "result of the absence of a snubber and/or a guard on the recoiler."[8] Garcia

---

[8] We note that, in his complaint, Garcia made specific mention of Becker Bros.'s addition of a "tension stand" or "tensioner" to the slitter line. However, he seeks to impose liability on Becker Bros. for its *failure* to modify the equipment or to *notify* his employer of the danger of using it and identifies no connection between the addition of the tension stand and his injury. (Cf. *Ortiz, supra,* 234 Cal.App.3d 178, 189, 191 [a prior owner of machinery made "extensive modifications" which "increas[ed] the unguarded area surrounding the machine"; although the analysis in this regard was unpublished, nonsuit in favor of the first owner on a negligence cause of action was reversed]; *Balido v. Improved Machinery, Inc., supra,* 29 Cal.App.3d at

argues, "It can be reasonably inferred by the materiality of the information concealed by [Becker Bros.] that the subsequent owner would have eliminated the defect which caused [Garcia's] amputation." Leaving to one side Garcia's characterization of Becker Bros.'s conduct beyond the allegations of his complaint, he ignores the trial court's point of how many steps removed from the sale between Becker Bros. and its immediate buyer (Columbia Steel) Garcia's use of the equipment as a Lexwest employee was.

██ In *Cabral, supra,* 51 Cal.4th 764, the court observed, "The general foreseeability of a collision between a vehicle leaving the freeway and one stopped alongside the road, and the relatively direct and close connection between negligent stopping and such a collision, weigh against creating a categorical exception to the duty of ordinary care." (*Id.* at p. 781.) Here, however, whatever duty an occasional seller may owe its immediate purchaser, we agree with the trial court that Becker Bros. owed no duty to Garcia—an employee of the purchaser who bought the machinery from the bank which repossessed it from the buyer who bought the slitter line from Becker Bros.—to pass along correspondence received from the manufacturer or to modify the slitter line, particularly in light of the California Code of Regulations provisions mandating that his employer safeguard the workplace as necessary. "All machines, parts of machines, or component parts of machines which create hazardous revolving, reciprocating, running, shearing, punching, pressing, squeezing, drawing, cutting, rolling, mixing or similar action, including pinch points and shear points, not guarded by the frame of the machine(s) or by location, shall be guarded." (Cal. Code Regs., tit. 8, § 4002.) Section 4002 of title 8 of the California Code of Regulations not only specifies the *employer's responsibility* for safeguarding the equipment but also provides for the *employer's discretion* in how this safeguarding is to be accomplished in the context of each particular workplace.

These considerations are inherently intertwined with the "public policy factors identified in *Rowland*—'the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved' (*Rowland, supra,* 69 Cal.2d at p. 113)—justify creating a duty exception . . . ." (*Cabral, supra,* 51 Cal.4th at p. 781.) "The overall policy of preventing future harm is ordinarily served, in

p. 639 [judgment of nonsuit affirmed for prior owner of allegedly defective press notwithstanding receipt of warnings of the press's safety deficiencies].)

tort law, by imposing the costs of negligent conduct upon those responsible. The policy question is whether that consideration is outweighed, for a category of negligent conduct, by laws or mores indicating approval of the conduct or by the undesirable consequences of allowing potential liability." (*Id.* at pp. 781–782.)

Garcia claims the slitter machinery was defective when the manufacturer (Cincinnati Incorporated) sold it to Becker Bros., and, under California law, the manufacturer and others in the stream of commerce (though not the occasional seller like Becker Bros.) are held strictly liable for the sale of a defective product, serving the policy of preventing future harm and ensuring that the costs of injuries resulting from defective products are borne by the proper parties. (*Ortiz, supra,* 234 Cal.App.3d at p. 187.) Garcia seeks to hold Becker Bros. liable for selling the slitter line in the same defective condition, without warning of the manufacturer's subsequent correspondence recommending safeguarding of the equipment or of a prior accident during its 26-year use of the equipment. The notices prepared by the manufacturer followed the promulgation of California Code of Regulations, title 8, section 4002, subdivision (a), which—since 1974—has mandated that hazardous revolving parts in any machine must be guarded. As evidenced by section 4002, subdivision (a), as well as the testimony of Cal/OSHA investigating engineer Vargas, the employer is responsible for ensuring the safeguarding of the machine and to prevent exposing employees to such hazards, which further serves the policy of preventing future harm. Becker Bros. was neither the manufacturer nor the designer of the equipment. Becker Bros. was not Garcia's employer. Yet, Garcia seeks to hold Becker Bros. liable for his injuries because it sold the slitter line machinery to Columbia Steel, the bank later repossessed it and his employer subsequently bought it, without Becker Bros. providing Garcia's employer with notice of the manufacturer's warnings or the prior injury sustained in its 26-year use of the equipment, despite the fact that section 4002 had been in place for 30 years at the time his injury occurred.

■ In our view, summary judgment was properly granted. As a matter of law, Becker Bros. owed Garcia no duty of care as a subsequent user of the slitter machinery manufactured by Cincinnati Incorporated, sold to Columbia Steel, repossessed by the bank and ultimately purchased by his employer. Because we conclude Becker Bros. was entitled to summary judgment as a matter of law, we need not address Garcia's challenges to the trial court's rulings on Becker Bros.'s objections to his evidence. (*Balido v. Improved Machinery, Inc., supra,* 29 Cal.App.3d at p. 639 [judgment of nonsuit affirmed for prior owner of allegedly defective press notwithstanding receipt of warnings of the press's safety deficiencies].)

## *DISPOSITION*

The judgment is affirmed. Becker is entitled to its costs of appeal.

Perluss, P. J., and Jackson, J., concurred.

On May 10, 2011, the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied July 27, 2011, S193461. Werdegar, J., did not participate therein.